UNITED STATES of America, Plaintiff-Appellee,

v.

Sandy CHECK, Defendant-Appellant.

No. 1463, Docket 77–1208.

United States Court of Appeals, Second Circuit.

Argued July 22, 1977.

Decided July 17, 1978.

Barry A. Bohrer, New York City (Ivan S. Fisher, New York City, of counsel), for defendant-appellant.

Peter D. Sudler, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., and Frederick T. Davis, Asst. U. S. Atty., New York City, of counsel), for plaintiff-appellee.

Before WATERMAN and MESKILL, Circuit Judges, and COFFRIN, District Judge.*

WATERMAN, Circuit Judge:

This is an appeal from a judgment order of the United States District Court for the Southern District of New York, Motley, J., entered upon a verdict of a jury convicting appellant Check, following a seven-day jury trial, on all counts of a three-count indictment charging him with two counts of possession of heroin with intent to distribute the drug, with each of the two counts also alleging an actual distribution of the drug, in violation of 21 U.S.C. § 841(a)(1) and with one count of conspiracy to distribute narcotic-drug, controlled substances in violation of 21 U.S.C. § 846. Upon his convictions Check was sentenced to a one-year term of imprisonment on each count, the sentences to be served concurrently. The court also imposed a three-year period of special probation to run consecutively to the terms of imprisonment.[1] In contending that his convictions should be overturned, Check raises troublesome arguments concerning the introduction into evidence of certain portions of the testimony of the

undercover police officer who was the government's principal witness against Check. Inasmuch as we believe that the district court's failure to exclude damaging hearsay testimony constituted prejudicial error, we reverse the judgment order entered against Check and remand for a new trial on all counts of the indictment.

The government's evidence at trial was primarily presented through the testimony of Stephen Spinelli, a detective in the New York City Police Department who had been assigned to investigate allegations that a fellow New York City police officer, Patrolman Sandy Check, was engaging in illegal narcotics trafficking.[2] Operating in an undercover capacity and using the pseudonym "Danny Gennaro," Spinelli was initially introduced to one William Joseph Cali, a confidential informant who knew Check and who agreed to introduce Spinelli to Check so that Spinelli, in his assumed role of a prospective purchaser of narcotics, could either substantiate or disprove the serious allegations of criminal conduct which had been made against Check.

Spinelli testified that, as anticipated, Cali arranged for a meeting with Check which was to take place on August 8, 1974 at Dave's Corner Restaurant, located at the corner of Canal Street and Broadway in lower Manhattan. Shortly after Spinelli and Cali had entered the restaurant Check appeared outside the front window of the building and motioned to have Cali meet with him outside. This Cali did and, after a conversation with Check, Cali rejoined Spinelli who was still seated in the restaurant. Cali refused to testify at the trial. So, in view of the potential hearsay problems connected with any attempt to elicit the content of Spinelli's conversations with him, and after an objection on hearsay grounds had already been voiced, the prosecutor employed a method of questioning which he

---

* Of the District of Vermont, sitting by designation.

1. The other individual named as a defendant, Philip Marasco, was also convicted on the conspiracy charge and was placed on probation for a term of two years. He has not appealed his conviction.

2. The prosecutor himself characterized Spinelli as "the Government's primary witness." Trial Transcript [hereinafter "Tr."] at 53.

argued circumvented any hearsay problems. The prosecutor, after establishing that Check and Cali had conversed and that Cali had thereafter returned to speak to Spinelli, inquired of Spinelli (as he would ultimately inquire of him at least twelve additional times): "Without telling us what Mr. Cali said to you, what did you say to him?"[3] In response, Spinelli told the prosecutor, and also, of course, the jury, what he had purportedly said to Cali:

> I—after we had the conversation, I instructed William Cali that by no means did I intend to front any sum of money to Sandy Check, I didn't particularly care for the fact that—initially he was supposed to come with an ounce of cocaine, and the taste which he had, which I was supposed to get prior to making the ounce buy of cocaine, was at his house, and due to the fact that it wasn't of good quality, I wasn't particularly concerned, as good faith wasn't being shown to me, especially for the fact I also told William Cali I had no intentions of giving Sandy Check $300 which William Cali owed to him from a previous narcotics deal. (Tr. at 67–68.)

Spinelli next testified that, following the conversation he had with Cali, Cali again departed the restaurant and spoke with Check. Cali then reentered the restaurant and "again [Spinelli and Cali] had a conversation." As before, Spinelli now related what he had supposedly "told William Cali":

> At that time I told William Cali I didn't particularly care whether or not Check was concerned about rats and not wanting to meet anyone new or about being busted by the man, and I had again still no intention of fronting any money or the $300 which Cali owed him. (Tr. at 68.)

Leaving the restaurant for a third time and having his third powwow with Check, Cali, as before, returned, talked to Spinelli and, again, Spinelli now testified as to what this third time he had "told William Cali":

> I told William Cali at the time I didn't particularly care whether or not the cocaine which I was supposed to get was 70 percent pure, nor the fact that it was supposed to come from a captain of detectives; I had again still no intention of fronting any money to him, the $1,200 for the ounce of cocaine or the $300 which William Cali owed to him. (Tr. at 70.)

Cali then left the restaurant for a further discussion with Check, returning shortly thereafter to relay additional information from Check to Spinelli. Spinelli testified that following this most recent shuttle, he "informed William Cali I still had no intentions of fronting the money, and that I was in agreement to allow him to again converse with Sandy Check."[4]

The scene of the negotiations now shifted. After instructing Cali to continue his discussions with Check, Spinelli left the restaurant, passed Check in the street and proceeded to a nearby topless bar. Cali arrived at the bar ten minutes later and there Spinelli and Cali had another conversation. At trial, the government asked of the undercover agent: "Without telling us what Mr. Cali said to you, what did you say to him during that conversation?"[5] In accordance with the limitations of the question, Spinelli faithfully responded:

> I had a conversation with William Cali and at the time I informed him that I was glad to find out that Check, after seeing me in the street, had felt somewhat more comfortable now, that he was going to make arrangements now to get the ounce of cocaine that I wanted, and that I was willing to wait with him to call Check at a quarter after 1:00, and then subsequently proceeded to pick up that ounce of cocaine. (Tr. at 76.)

Cali then made a telephone call to Check, which resulted in the scheduling of another meeting for the following day, August 9, and, after that telephone call, Spinelli and Cali again conferred, Spinelli advising Cali:

**3.** *Id.* at 67.

**4.** *Id.* at 71.

**5.** *Id.* at 76.

I told William Cali that I was willing to wait until the following day to get the ounce of cocaine, that I could understand that there was problems with Sandy Check's supplier, and that I would definitely have the money with me, and as arrangements, I would drop Cali off to meet Sandy Check and wait for him a few blocks away from the location. (Tr. at 80.)

As scheduled, on August 9 Spinelli and Cali returned to the lower east side of Manhattan. After Spinelli discharged Cali from the automobile in which both were riding, Cali met with Check and another man.[6] Meanwhile, Spinelli parked the car and walked to a nearby coffeeshop where he was to meet Cali. Cali arrived and he and Spinelli then proceeded to Little Peter's Bar at East 5th Street and Second Avenue and entered the bar. In a repetition of the events of the preceding day, Check appeared outside a window and signaled for Cali to meet with him there. Cali left the bar, conversed with Check, and returned to convey information to Spinelli. Questioned by the prosecutor concerning this, Spinelli again testified about what he "told William Cali."

> I told William Cali at this time I had no intentions of purchasing an ounce of heroin, I didn't come there to purchase heroin, I cam [sic] here to purchase an ounce of cocaine, and I wasn't going to pay

$2,200 for an ounce of heroin when the original deal was set up for $1,200 for an ounce of cocaine.

> I had become somewhat annoyed at the situation at the time, and I instructed Cali that I wouldn't even pay $1,100 for a half an ounce of heroin.

> Subsequently, I also instructed him as a fact I had no intention of fronting him the money for this, and that I wasn't by any means going to buy heroin. I wanted to buy cocaine, and that's what I was there for. (Tr. at 104.)

Cali's shuttling resumed. Following Cali's second talk with Check, Spinelli remained adamant in his refusal to purchase the heroin Check was now allegedly attempting to peddle:

> After that conversation, I again instructed Cali that I had no concern whatsoever to buy heroin, I was going to remain with what I originally wanted; I wanted the cocaine and I didn't come there to purchase the heroin.

> At the time I told him it may be good, it may be able to take a 4 to 1 cut, but that's not why I was there.

> I wanted the cocaine. I wasn't concerned with good-quality heroin which was being offered to me. I wanted the cocaine. (Tr. at 105.)

Other "little trips" followed. One produced an offer by Check to sell a "taste" of

---

**6.** Prior to discharging Cali, Spinelli and Cali had another one of their conversations, the contents of which were conveyed to the jury during Spinelli's testimony:

> While en route to that location, I observed Sandy Check in the street with one other individual, at the time an unknown male to me, and after a conversation with William Cali I informed William Cali that I was glad to see that Sandy Check did in fact intend to trust me, and that there wouldn't be any problems, I would be able to confront him that day, being that he was with his runner Duky. (*Id.* at 85.)

Although it seems from the context of this testimony that Spinelli, who at first was ignorant of the identity of Check's companion, could have learned of the unknown male's identity only from Cali, and despite a hearsay objection from Marasco's counsel on that very ground, the district judge overruled the objec-

tion. Subsequently, there were further references to Check's companion as being his runner "Duky," *see Id.* at 92, 93, and in the first such subsequent incident defense objections followed, *see Id.* at 92–93. Ultimately, the district court granted a defense motion to strike Spinelli's testimony concerning Check's being with "his runner Duky," *see Id.* at 103, the reference being stricken "because that is something he learned from Cali." This belated action was taken, however, only after the government had actually conceded that "[t]he obvious inference to be drawn is that [Spinelli] knew [it was Check's runner Duky] because Cali identified the person." *Id.* at 101. There may be legitimate question, we believe, whether the jurors, having thrice heard the man identified as "Check's runner Duky," could honestly extirpate from their minds the repeated damaging references when instructed to do so by the judge.

heroin for $50. With regard to this offer, Spinelli told William Cali:

> I instructed Mr. Cali that I had no intention of even getting a taste of heroin which would cost me $50, I wasn't concerned with purchasing heroin, I wanted to purchase the cocaine. I was in the business for cocaine, and that's what I wanted, not heroin. (Tr. at 106–07.)

Spinelli eventually changed his mind, however, for "[a]fter having a conversation with William Cali, [he] again instructed [Cali that he'd] be willing to take a taste of heroin for $50 if it was that good, and if it could take a 4 to 1 hit." [7] Spinelli instructed Cali to tell Check of his willingness to purchase the heroin for $50 and of his willingness, "if this heroin was of such good quality [that] it could take a 4 to 1 hit," [8] to purchase "large quantities of it." [9]

After Spinelli had finally agreed to purchase the "taste" of heroin from Check, Spinelli and Cali left Little Peter's Bar. Spinelli took $1,500 in cash from the trunk of his parked vehicle. He then rejoined Cali in the general vicinity of Little Peter's Bar and, shortly thereafter, Cali resumed the relaying of messages between Spinelli and Check who was standing with his runner within eyesight of Spinelli.[10] Through his testimony, cast in terms of what he said to Cali, Spinelli put before the jury the information supplied to him by Cali:

> At this point I was somewhat annoyed due to the fact that we hadn't been able as yet to complete the transaction. I told William Cali that I wasn't at all concerned with the problem that Sandy Check was having with his connection, and that because of his connection wasn't being supplied he couldn't get the heroin, there was a problem with the heroin, and now I wasn't going to be able even supposedly to get that. (Tr. at 118.)

The indirect dealing through Cali abruptly came to an end when Check, responding to Spinelli's gesture of disgust at the unproductive course the negotiations had followed, motioned for Spinelli to cross the street and meet with him personally. After being introduced to Check, Spinelli expressed his annoyance at Check's inability to supply either the cocaine Spinelli had originally sought or the heroin which Check had allegedly suggested he could supply. Spinelli testified that Check answered that he had attempted to get the heroin but, inasmuch as his suppliers were "night people," he had been unable to contact them so quickly. Spinelli and Check agreed on a price of $50 for the taste of heroin, Spinelli paid Check the $50, and Check then told Spinelli that Spinelli would get the "taste" later that evening, further details of the method of delivery to be provided by way of a phone call from Check's "runner" Duky to Cali at 10 p.m. that night. When Spinelli questioned whether Duky could be trusted, Check answered that he could be. The conversation ended with Check informing Spinelli that in the future Check would be able to provide any desired quantity of good-quality cocaine. Three days later, on August 12, 1974, Spinelli finally received from Cali the taste of heroin for which he had paid the $50.

The following day, August 13, 1974, Spinelli, accompanied by Cali, met Check at Little Peter's Bar. Check and Spinelli, out of Cali's hearing, then discussed the undercover agent's prospective purchase of one-half an ounce of heroin and agreed upon a price of $1,200 for the heroin. Spinelli further agreed to pay, and actually paid, an additional $150 to Check in partial satisfaction of a debt Cali owed Check from a previous narcotics transaction. Once he had received the $1,350 from Spinelli, Check left Little Peter's, returning in about forty minutes. Inside the bar he instructed Cali, who was still with Spinelli inside the bar, to pick up a package from "Duky," who was standing on the street just outside the bar. After Cali had left, Spinelli and Check also left the bar, with Spinelli rejoining Cali

---

**7.** *Id.* at 107.

**8.** *Id.* at 111–12.

**9.** *Id.* at 112.

**10.** *See* note 6 *supra*.

outside. Spinelli and Cali then hailed a taxicab and, once outside, Cali gave Spinelli an envelope which contained approximately one-half ounce of heroin.

The next meeting between Check and Spinelli occurred on August 22, 1974 at the ROK Bar on Second Avenue and 4th Street in Manhattan. Check assured Spinelli that in the future he could deliver large amounts of either cocaine or heroin, but Check indicated that he presently would not be able to provide cocaine of good quality. The two men did, however, agree upon a price of approximately $5,600 for the purchase of one-eighth of a kilogram of heroin and, according to Spinelli, the two men then made extensive arrangements for the use of a code which Check would use when conveying to Spinelli's answering service information pertaining to the proposed purchase of narcotics. Check and Spinelli then had a wide-ranging discussion of the narcotics business. Relative to these discussions, the prosecutor, during his direct examination of the undercover officer, asked the witness: "Detective Spinelli, during your conversations with Mr. Check did Mr. Check ever make a reference to someone being killed?" [11] Before the witness could answer, a defense objection that the question was leading was sustained. Rephrasing the question, the prosecutor now asked, without any objection by the defense, what Check had said and Spinelli responded that Check had remarked "that if he had any problems with anyone he wouldn't hesitate to shoot them." [12] The testimony about the meeting of August 22 closed with Spinelli testifying that Check told Spinelli that he, Check, would immediately attempt to meet his connections that evening but that his failure to return to the ROK Bar in a short while would mean that he had been unable to procure the narcotics that evening. Should that be the case, Check told Spinelli that he would call him in the future. Check then left the bar, did not return, and never again contacted Spinelli.

Although Spinelli made a number of attempts to reestablish contact with Check, nearly two years transpired before the officer was able to do so. Finally on August 5, 1976, Spinelli, who now was wearing a recording device, taped a conversation with Check which consisted almost exclusively of Spinelli's discussing past and prospective narcotics dealings, and Check's uttering generally uninformative, monosyllabic responses to Spinelli's provocative, probing entreaties.

Although the alleged two sales of heroin to Spinelli had occurred in August of 1974, it was not until December 1, 1976 that Check was arrested on the charges stemming from these alleged crimes.

Testifying in his own defense at his trial, Check did not deny that he had met with Cali on August 8, 1974, at Dave's Corner Restaurant. According to Check, however, he had agreed to meet with Cali on that occasion only because Cali had previously proposed helping Check make "a good drug arrest" [13] and shortly before their rendezvous Cali had called Check to tell him that he might "have something for" [14] him and that "it was important that [Check] meet him." [15] He testified that when he learned from Cali that Spinelli was interested in purchasing narcotics rather than in selling them, he was no longer interested in pursuing the matter. He denied meeting with Spinelli on August 9, 1974, and, accordingly, denied that he had agreed at that time to sell narcotics to Spinelli or that he had received $1,350 from Spinelli on that occasion. While admitting that he had met and talked with Spinelli at the ROK Bar on August 22, 1974, Check testified that he had not filed a report of the incident, as departmental regulations required, because he had regarded Spinelli as a "crackpot" [16] inasmuch as Spinelli "was talking quite openly

11. Tr. at 194.

12. *Id.* at 194.

13. *Id.* at 637.

14. *Id.* at 638.

15. *Id.* at 638.

16. *Id.* at 645.

at the bar about drugs, and he didn't impress [Check] at all as being anything, being a smart person, because a person that deals in drugs doesn't let everybody know their business." [17]

Appellant's primary contention on appeal is that significant portions of Detective Spinelli's testimony were inadmissible hearsay which the government should not have been permitted to offer against him at trial. In its attempt to refute this contention the government pursues two lines of argument. It first asserts that Check has waived any sound objection he might have on hearsay grounds for he supposedly failed to advance such grounds in a timely fashion at trial. Alternatively, the government claims that, assuming arguendo that Check did preserve the issue for consideration on appeal, the district court nonetheless did not err in admitting those portions of Spinelli's testimony which Check claims are objectionable on hearsay grounds inasmuch as those statements which Check challenges as inadmissible hearsay, were not, in fact, hearsay. Reaching the substantive issue, we hold that much of Spinelli's testimony was indeed inadmissible hearsay.

At trial the government took the position, a position to which it seemingly continues to adhere,[18] that Spinelli's testimony regarding his conversations with Cali could not constitute hearsay because Spinelli carefully limited that testimony to what he said to Cali and he scrupulously avoided relating any statements which Cali had made to him. Check argues, however, that, notwithstanding the artful phrasing of the prosecutor's questions and Spinelli's equally adroit responses to them, Spinelli actually was on numerous occasions throughout his testimony in essence conveying to the jury the precise substance of the out-of-court statements Cali made to him. Check further contends that, even if Spinelli's testimony were not excludable on the ground

that he was merely serving as an improper conduit for Cali's hearsay statements, there is an additional reason why Spinelli's testimony of what he told Cali would nonetheless still be inadmissible hearsay. Specifically, Check contends that, notwithstanding the government's position at trial and the district court's holding, the federal courts do not recognize any exception to the hearsay rule, or, except in the limited circumstances set forth in Fed.R.Evid. 801(d), any exclusion from the definition of hearsay, which would permit testimony in court relating to the prior out-of-court statements of a witness merely because the witness is available at trial for cross-examination and subject to cross-examination concerning those statements. On either of the grounds he advances, Check is clearly correct.

We initially address the government's contention that, by failing to make a timely and specific objection at trial, Check has waived any claim that those portions of Spinelli's testimony regarding his conversations with Cali were inadmissible hearsay. While Check's basis for the objection might perhaps have been expressed with greater clarity and specificity earlier in Spinelli's testimony, we find that under the circumstances prevailing at trial the issue of whether Spinelli was serving as a conduit for Cali's inadmissible hearsay was properly preserved for appellate consideration.

First of all, from the very beginning of Spinelli's testimony Check's attorney objected, voicing a "continuing objection to any conversation with Cali." [19] Although Check's attorney did not immediately elaborate upon the nature of his objection, Marasco's attorney did, stating that it was "just straight hearsay." [20] That the general nature of the objection was sufficiently clear is illustrated by the prosecutor's immediate response that he would "phrase the questions in terms that do not violate the hearsay rule." [21] However, even assuming that

---

**17.** *Id.* at 644.

**18.** *See* Appellee's Brief at 13 ("Not only was Spinelli a witness who testified at trial and was subject to cross-examination, . . . .").

**19.** Tr. at 64.

**20.** *Id.* at 64.

**21.** *Id.* at 64.

Check need not ritualistically have stated that he joined in the basis of objection articulated by counsel for Marasco, it does seem that at this early stage of Spinelli's testimony, Check's objection was not as yet sufficiently precise to raise and preserve the issue which he seeks to have resolved on appeal.

Nevertheless, even though Check's initial articulation of the grounds for his objection was not precisely specific, we are not inclined to find a waiver under the circumstances here. While, upon our careful and unhurried examination of the transcript in the relaxed atmosphere of appellate chambers it may seem to us apparent from the very start of Spinelli's testimony exactly what the government was attempting to do, it would be unreasonable for us to hold that unless Check's counsel, in the heat of a hotly contested criminal trial, instantly recognized Spinelli's carefully contrived testimony for what it really was, Check's right to object was affirmatively waived. The traditional view is that an objection, or a motion to strike, is untimely only if the objection, or motion to strike, was not "made as soon as the ground of it is known, or reasonably should have been known to the objector." 21 C. Wright & K. Graham, Federal Practice & Procedure: Evidence § 5037, at 188 (1977), quoting J. Wigmore, Code of Evidence 25 (3d ed. 1940). Here, as it became increasingly apparent exactly what the government was attempting to accomplish through the use of Spinelli's testimony,[22] Check's counsel began articulating with greater particularity the basis of his objection to that testimony. For example, as soon as the nature of Spinelli's testimony had become reasonably clear, he objected to the evidence on the grounds that "[t]his is what Mr. Cali is telling,"[23] and indeed Judge Motley granted Check's motion to strike that particular answer. The prosecution persisted, however, in eliciting from Spinelli the hearsay information the undercover officer had acquired from Cali. This persistence produced additional objections and motions to strike, the specificity of which are beyond question. For instance, counsel told the court that "[w]hat is merely being done is Cali's information is being paraphrased by this witness [Spinelli]."[24] As we discuss later in this opinion, the district judge certainly understood the nature of the objections;[25] indeed, on a few isolated occasions she agreed that some of Spinelli's testimony was objectionable, and she sustained objections or granted motions to strike for the reasons advanced by Check's attorney.[26]

■ Finally, assuming arguendo that counsel's delay in particularizing his objections to the hearsay contained in Spinelli's testimony can be considered an unreasonably long delay, it is obvious that, throughout all the time he was objecting, the principal ground he was advancing was that Spinelli's testimony contained inadmissible hearsay. Thus, the district court was generally advised of the grounds of the objections. Moreover, as we discuss later, it was not only obvious that Spinelli was conveying to the jury Cali's inadmissible hearsay but it was also just as clear that Check was being substantially prejudiced by that testimony. Under these circumstances it was "plain error" for the district court to have refused to sustain Check's counsel's objections to Spinelli's testimony and to have denied his final motions to strike all of Spinelli's extensive testimony regarding what "he told William Cali." Although at

22. The government surely must have been cognizant of the basis of Check's objection. Thus, one of the purposes to be served by the requirement that objections must be made with sufficient specificity was served. We do not, however, agree with Check's accusation that the government never had any intention of calling Cali as a witness. Instead, it seems much more likely that Cali's recalcitrance developed on the eve of trial and it was at that point that the government devised a new strategy for introducing the statements Check allegedly made to Cali.

23. *Id.* at 79.

24. *Id.* at 92–93. Most of the objections Check advanced thereafter remained lucid and precise. *See id.* at 117, 118, 140, 141, 151.

25. *See id.* at 118–20.

26. *See id.* at 79, 150–51.

trial Check's attorney seemed to base his frequently expressed position in support of these objections to Spinelli's testimony on the ground that Spinelli was merely "paraphrasing" Cali's hearsay statements,[27] the gravamen of the objections was that Spinelli's testimony was inadmissible hearsay, and Spinelli's testimony regarding his own prior statements was just as much inadmissible hearsay as his narration of Cali's comments was inadmissible hearsay. Spinelli's testimony regarding his own prior statements was plainly inadmissible, for as developed more fully later in this opinion, those statements fit neatly within the definition of hearsay, see Fed.R.Evid. 801(c), were not excluded from the definition of "hearsay" by virtue of Fed.R.Evid. 801(d), and did not satisfy the requirements of any of the hearsay exceptions recognized in Rules 803 and 804 of the Federal Rules of Evidence.[28] Hence it would seem that, in view of the

**27.** It may well be that, by objecting to Spinelli's testimony as "self-serving," see, e. g., Tr. at 92, defense counsel was attempting to bring to the attention of the district court the well-recognized principle that, generally speaking, a witness's prior consistent statements are inadmissible because "[i]f [the witness's testimony in court] is an improbable or untrustworthy story, it is not made more probable or more trustworthy by any number of repetitions of it." 4 J. Wigmore, Evidence § 1124, at 255 (Chadbourn rev. 1972). Such an objection, grounded in the notion of relevancy, would be aimed directly at any attempt by the proponent to use the witness's prior statements for the limited purpose of enhancing his credibility.

**28.** Fed.R.Evid. 103(d), expressly preserving the "plain error" doctrine of Rule 52 of the Federal Rules of Criminal Procedure, provides: "Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court." It is generally true, of course, that "[o]therwise inadmissible hearsay to which no objection has been lodged may be considered by the trier-of-fact to the extent of its probative value." United States v. Leaman, 546 F.2d 148, 150 (5th Cir.), cert. denied, 431 U.S. 917, 97 S.Ct. 2180, 53 L.Ed.2d 227 (1977); accord, Flores v. Estelle, 513 F.2d 764, 766 (5th Cir.), cert. denied, 423 U.S. 989, 96 S.Ct. 401, 46 L.Ed.2d 308 (1975); Smith v. United States, 343 F.2d 539, 542 (5th Cir.), cert. denied, 382 U.S. 861, 86 S.Ct. 122, 15 L.Ed.2d 99 (1965); Glenn v. United States, 271 F.2d 880, 883 (6th Cir. 1959). And we certainly would not be disposed towards finding "plain error" here, as we do, if Check's attorney had merely stood mute while the damaging testimony was being admitted. Under certain unusual conditions, however, the admission of hearsay evidence to which an entirely satisfactory objection has not been made may require reversal of a criminal conviction if the admission of such evidence constitutes plain error affecting substantial rights of the defendant. Smith v. United States, supra, 343 F.2d at 542 (Wisdom, J.); accord, United States v. Leaman, supra, 546 F.2d at 150; Flores v. Estelle, supra, 513 F.2d at 766; Glenn v. United States, supra, 271 F.2d at 883.

We believe that the case before us now presents such an unusual situation, and that reversal would be appropriate even if Check had not preserved the issue of "paraphrasing" for consideration on appeal. It is true that counsel was not of as much assistance to the district judge as he might have been in quickly bringing to her attention the principles of law which would have required exclusion of the evidence, but as already noted, counsel forcefully indicated on numerous occasions his position that Spinelli's testimony regarding his conversations with Cali was inadmissible hearsay and he eventually did satisfactorily articulate one specific ground for that belief. He did not, it is true, specifically challenge the prosecutor's frequently expressed, and clearly erroneous, theory that under some supposed exception to the hearsay rule the witness Spinelli could testify with impunity as to his own prior statements, a theory which has had its adherents and which indeed found expression in what was formerly Rule 63(1) of the Uniform Rules of Evidence. See note 38 infra; see generally 4 Weinstein's Evidence ¶ 801(d)(1)(B)[01]. But that theory was considered and expressly rejected by the drafters of the Federal Rules of Evidence. See 4 Weinstein's Evidence ¶ 801(d)(1)(B)[01]. Thus, at the time the trial below was conducted, there was no basis upon which such a theory could have been or should have been advanced by the prosecutor. In agreeing with the prosecutor that "a person is entitled to testify as to what he said," Tr. at 139; see id. at 92, 119, the district judge adopted a theory of law which, though not an unreasonable one, has been explicitly rejected in the Federal Rules of Evidence. By taking such a position at the prosecutor's urging the district judge committed a clear mistake of law. As will be developed subsequently in this opinion, the sheer magnitude of the improperly admitted evidence makes it difficult to believe that substantial rights of the defendant were not affected by the admission of those portions of Spinelli's testimony which were hearsay. We therefore can find without difficulty that the district court committed "plain error affecting substantial rights of the defendant."

substantial prejudice Check suffered through the government's introduction of Spinelli's hearsay testimony, the continuous admission of the hearsay, over continuous hearsay objections made by Check's counsel, certainly constituted "plain error" affecting Check's substantial rights. Fed.R.Crim.P. 52(b).

▋ Turning to the merits, we agree with Check that for much of his testimony Spinelli was serving as a transparent conduit for the introduction of inadmissible hearsay information obviously supplied by and emanating from the informant Cali. Indeed, it would be virtually impossible to draw any other conclusion from an examination of those portions of the transcript from which we have quoted extensively in our narration of the facts here. Moreover, the hearsay introduced through Spinelli was not only damaging in character but extensive in scope. Thus, the jury learned from Spinelli's "I told William Cali" responses that:

1) Check wanted Spinelli to front the money not only for the narcotics he wished to purchase from Check but also to cover $300 which William Cali owed Check from a previous narcotics deal

2) Check kept narcotics at his house

3) Check was supposed to arrive at the meeting of August 8, 1974 with an ounce of cocaine and a taste of it, but, inasmuch as the cocaine was not of good quality, Check did not bring the drugs with him

4) Spinelli proposed to pay (and Check was to receive) $1,200 for an ounce of cocaine he wished to purchase from Check at the conclusion of their indirect negotiations of August 8

5) Check was concerned about "rats" and not wanting to meet anyone new [and concerned] about being "busted by the man"

6) The cocaine that Check would be providing as a result of the negotiations of August 8 would be 70 percent pure and it would come from a captain of detectives

7) After seeing Spinelli in the street, after he departed Dave's Corner Restaurant, Check felt more comfortable about dealing with him and would go ahead and try to arrange for a sale of an ounce of cocaine to Spinelli

8) Check would produce the ounce of cocaine that same afternoon of August 8, 1974

9) Check had cocaine suppliers

10) As of August 8, 1974 Check was having trouble with these cocaine suppliers and, as a result, could not produce the cocaine which he had attempted to procure that afternoon

11) Check had a "runner" and his name was Duky [29]

12) Check dealt in heroin as well as in cocaine

13) Check was proposing on August 9, 1974 that Spinelli pay $2,200 for an ounce of heroin or $1,100 for one-half ounce of heroin

14) The heroin which Check was proposing to sell to Spinelli on that date was of such good quality that it could take a 4 to 1 hit

15) Check was having trouble with his heroin suppliers as well as his cocaine suppliers

16) Check kept insisting that Spinelli "front" money for any narcotics he wished to purchase from Check

17) Check was also proposing on August 9 that Spinelli pay $50 for a taste of heroin

Despite its unwillingness to exclude all of Spinelli's testimony which conveyed the foregoing hearsay information, the district court did exclude or strike some of it,[30] reacting at one point to the transparency of the entire line of questioning by admonishing the witness Spinelli that "[t]hat's the

---

**29.** As noted above, see note 6 supra, the jury, after being exposed to this inadmissible information on three different occasions, was eventually instructed to disregard it. Whether they actually did or could, in the context of the barrage of other damaging and inadmissible testimony regarding Check, is problematic at best.

**30.** See note 26 supra.

way you should tell it to us, instead of telling us in effect what he said, because he is not here to be cross-examined." [31] The judge then further expressed her misgivings about Spinelli's entire testimony by remarking that Spinelli "doesn't seem to be [testifying to just his part of the conversation]. He seems to be weaving the two together. We can't distinguish which is which." [32] In fact some of Spinelli's "paraphrasing" was so blatant and obvious that at one point even the prosecutor felt compelled to admit that "[t]he obvious inference to be drawn [from Spinelli's testimony regarding Check's being with his runner Duky] is that he [Spinelli] knew it because Cali identified the person." [33]

There is, furthermore, no doubt that the out-of-court statements uttered by Cali, audaciously introduced through the artifice of having Spinelli supposedly restrict his testimony to his half of his conversations with Cali, were being offered to prove the truth of the matters asserted in them. This conclusion follows inescapably from the fact that, with the exception of one confused and isolated remark,[34] the government constantly took the position at trial that the challenged portions of Spinelli's testimony avoided the proscription against the use of hearsay not because they were not being offered for the truth of the matters asserted but rather because they were Spinelli's *own* out-of-court statements and he was testifying in court and could be cross-examined. In other words, the government was apparently arguing that the out-of-court statements were admissible because they were somehow excluded from the definition of hearsay or qualified for some supposed exception to the hearsay rule as was formerly contained in Rule 63(1) of the Uniform Rules of Evidence. *See* notes 28 *supra*; 38 *infra*. In particular, the fact that the testimony, whether it be Cali's via a Spinelli narrative or Spinelli's own, was being offered for the truth of the matters asserted, was graphically demonstrated by the government's concession at trial that "[a]s far as what William Cali said, that is hearsay; we acknowledge that. As far as what Detective Spinelli may have said to Cali on that day, it is not hearsay. He is present in court ready to be cross-examined, Detective Spinelli, as to those statements." [35] A concession that *Cali's* statements would have been hearsay is an admission that the purpose for which the statements were being offered at trial (irrespective of whether they were to be regarded as Spinelli's or Cali's) was to prove the truth of the matters asserted therein. We thus conclude that, in substance, significant portions of Spinelli's testimony regarding his conversations with Cali were indeed hearsay, for that testimony was a transparent attempt to incorporate into the officer's testimony information supplied by the informant who did not testify at trial. Such a device is improper and cannot miraculously transform inadmissible hearsay into admissible evidence. *United States v. Lubrano,* 529 F.2d 633, 637 (2d Cir. 1975), *cert. denied,* 429 U.S. 818, 97 S.Ct. 61, 50 L.Ed.2d 78 (1976); *United States v. Borelli,* 336 F.2d 376, 392 (2d Cir. 1964), *cert. denied,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). The district judge, as mentioned, eventually appreciated how pervasively Cali's hearsay information had infected Spinelli's testimony [36] and, once this contamination had become evident, Judge Motley should have granted Check's motions to strike [37] all of

31. Tr. at 119.

32. *Id.* at 119–20.

33. *Id.* at 101.

34. *See* note 43 *infra*.

35. Tr. at 86.

36. *See id.* at 119–20.

37. *See id.* at 140, 151. We should mention that there is some indication in the record, *see id.* at

5 ("I will take it subject to connection."); *id.* at 138–39 ("[Cali] is not [a co-conspirator in this case]? I thought he was named as a co-conspirator."), that Judge Motley may have been allowing some of Spinelli's "paraphrasing" testimony because she believed that Cali, who was described in the indictment as a co-conspirator, was indeed a true co-conspirator rather than a government agent. If the district judge was, in fact, taking Spinelli's "paraphrasing" testimony subject to other evidence connecting Cali with the conspiracy, then that testimony cer-

Spinelli's testimony narrating his conversations with Cali.

▮ Even if we were inclined to accept the government's contention that Spinelli's testimony at trial was an honest narration of various out-of-court statements he himself had made, and we were thereby to exalt form over substance to the extent of blinding ourselves to the true character of Spinelli's answers, we would nonetheless continue to hold that substantial portions of Spinelli's testimony were inadmissible hearsay. Throughout the trial the government adamantly maintained, and Judge Motley unfortunately agreed, that, if the out-of-court statements which Spinelli was relating during his in-court testimony could properly be regarded as his very own statements, and not merely as a subterfuge for the indirect introduction of Cali's hearsay, those statements were admissible under some exclusion from the definition of hearsay or under some exception to the hearsay rule which would permit them to be admitted as the out-of-court statements of a person who testifies at trial and who can therefore be subjected to the rigors of cross-examination as to them. Though not pressed with comparable fervor, the government in its brief on appeal apparently continues to take this position. In response, Check argues that under the law of evidence presently in force in the federal courts there is no such exception to the hearsay rule. We agree. As Check points out, such a broad exception for the prior statements of a witness was indeed recognized in former Rule 63(1) of the Uniform Rules of Evidence.[38]

*See* Introductory Note to Article VIII, Notes of the Advisory Committee on Proposed Rules of Evidence, 56 F.R.D. 183, 289–90 (1972); Note to Rule 801, Notes of the Advisory Committee on Proposed Rules of Evidence, *supra,* 56 F.R.D. at 296 (1972); 4 J. Wigmore, Evidence § 1124, at 255 n.2. It is clear, however, that the Federal Rules of Evidence contain no comparable exception to the hearsay rule. Introductory Note to Article VIII, Notes of the Advisory Committee on Proposed Rules of Evidence, *supra,* 56 F.R.D. at 289–90; 4 Weinstein's Evidence ¶ 801(d)(1)(B)[01]; *see* Fed.R.Evid. 803, 804. Nor does the provision which *is* contained in the Federal Rules of Evidence relating to the use, as substantive evidence, of a witness's prior consistent statements support the government's position here. To be sure, Fed.R.Evid. 801(d)(1)(B), by excluding from the definition of hearsay, *see* Fed. R.Evid. 801(c), certain prior consistent statements which otherwise would be so included, does potentially permit some of a witness's prior consistent statements to be used as substantive evidence to prove the truth of the matters asserted.[39] But the class of such prior statements which can potentially be so utilized as substantive evidence because of their exclusion from the definition of hearsay is carefully confined to those "[p]rior consistent statements [which] traditionally have been admissible [but only for the rehabilitative purpose of] rebut[ting] charges of recent fabrication or improper influence or motive." Note to Rule 801, Notes of the Advisory Committee

tainly should have been struck once the government had conceded, *see id.* at 139, that Cali was not a true co-conspirator but instead was a government agent at the time of his dealings with Check.

38. Rule 63. Hearsay Evidence Excluded—Exceptions. Evidence of a statement which is made other than by a witness while testifying at the hearing offered to prove the truth of the matter stated is hearsay evidence and inadmissible except:

(1) Previous Statements of Persons Present and Subject to Cross Examination. A statement previously made by a person who is present at the hearing and available for cross examination with respect to the

statement and its subject matter, provided the statement would be admissible if made by declarant while testifying as a witness;

. . .

Rule 63(1), Uniform Rules of Evidence (1953). *See* note 28 *supra.*

39. Of course, a statement satisfying the requirements of Fed.R.Evid. 801(d)(1)(B) is merely excluded from the definition of hearsay and its introduction can therefore not be thwarted on the ground that it is hearsay inadmissible under Fed.R.Evid. 802. However, a statement, though meeting the requirements of Fed.R. Evid. 801(d)(1)(B), obviously may be inadmissible on some basis other than hearsay.

on Proposed Rules of Evidence, *supra,* 56 F.R.D. at 296; *see* 4 Weinstein's Evidence ¶ 801(d)(1)(B)[01], at 801–100. Such prior statements are, of course, those which are "offered to rebut an express or implied charge against [the witness] of recent fabrication or improper influence or motive," Fed.R.Evid. 801(d)(1)(B), and which were made prior to the time the supposed motive to falsify arose. *E. g., United States v. Lombardi,* 550 F.2d 827, 828–29 (2d Cir. 1977) (per curiam); *accord, United States v. McGrath,* 558 F.2d 1102, 1107 (2d Cir. 1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1239, 55 L.Ed.2d 765 (1978); *United States v. Fayette,* 388 F.2d 728, 733 (2d Cir. 1968). To repeat, aside from the relatively small number of prior statements that are admissible as being within the dispensation conferred by Fed.R.Evid. 801(d)(1)(B), a witness's prior statements offered to prove the truth of the matters asserted therein are not immunized from the proscriptive effect of the hearsay rule.[40] We therefore conclude that the challenged portions of Spinelli's testimony were inadmissible hearsay even if they could be regarded as being a literal recitation of Spinelli's own prior out-of-court statements.

On appeal, however, the government, dramatically deemphasizing the theory of admissibility so sedulously (but erroneously) pursued at trial, now suggests without blanching that the most substantial reason why Spinelli's testimony avoided the proscriptions against the use of hearsay was because that testimony was *not* offered for the truth of the matters asserted therein but was offered instead for more limited,

and allegedly permissible, purposes. Specifically, relying upon *United States v. Lubrano, supra,* 529 F.2d at 637, and *United States v. Manfredonia,* 414 F.2d 760, 765 (2d Cir. 1969), the government contends that Spinelli's testimony "was admitted solely 'to aid the jury in understanding the background events leading up to the crimes in question.'"[41] In addition, the government asserts that the statements Spinelli supposedly made at the time he was talking to Cali constituted "nonhearsay 'verbal acts,' that is, they were 'contemporaneous utterances explaining non-verbal conduct or its tenor.'"[42] We do not, however, find it necessary to decide whether Spinelli's testimony was admissible for either of these more limited purposes, for there is venerable precedent for disregarding the unseasonable advancement of such purposes to salvage evidence introduced by the government at a criminal trial when the grounds repeatedly advanced in the trial court differ markedly from those urged upon the appellate court. In circumstances not at all dissimilar from those confronting us now, Justice Cardozo, writing for a unanimous Court, offered a characteristically astute analysis:

"The testimony was neither offered nor received for the strained and narrow purpose now suggested as legitimate. It was offered and received as proof of a dying declaration. What was said by Mrs. Shepard lying ill upon her deathbed was to be weighed as if a like statement had been made upon the stand. The course of the trial makes this an inescapable con-

---

**40.** In certain circumstances such evidence might gain admission as substantive evidence under one of the hearsay exceptions which *are* set forth in Rules 803 and 804 of the Federal Rules of Evidence, provided, of course, the evidence is not of a character which is incapable of satisfying the standards of any of those hearsay exceptions. *See United States v. Oates,* 560 F.2d 45, 84 (2d Cir. 1977). Moreover, inasmuch as Spinelli's prior statements could not satisfy the standards set forth in Fed.R.Evid. 801(d)(1)(B), the statements were not admissible even for the more limited purpose of bolstering the witness's credibility. *See, e. g., United States v. Arroyo-Angulo,* 580 F.2d 1137, 1146, (2d Cir. 1978) (It is a

"well established [rule] of evidence that absent an attack on the veracity of a witness, no evidence to bolster his credibility is admissible.").

**41.** Appellee's Brief at 13–14, quoting in part from *United States v. Lubrano,* 529 F.2d 633, 637 (2d Cir. 1975), *cert. denied,* 429 U.S. 818, 97 S.Ct. 61, 50 L.Ed.2d 78 (1976).

**42.** Appellee's Brief at 14 n.**, quoting in part from *United States v. D'Amato,* 493 F.2d 359, 363 (2d Cir.), *cert. denied,* 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d 50 (1974).

clusion. The Government withdrew the testimony when it was unaccompanied by proof that the declarant expected to die. Only when proof of her expectation had been supplied was the offer renewed and the testimony received again. For the reasons already considered, the proof was inadequate to show a consciousness of impending death and the abandonment of hope; but inadequate though it was, there can be no doubt of the purpose that it was understood to serve. There is no disguise of that purpose by counsel for the Government. They concede in all candor that Mrs. Shepard's accusation of her husband, when it was finally let in, was received upon the footing of a dying declaration, and not merely as indicative of the persistence of a will to live. Beyond question the jury considered it for the broader purpose, as the court intended that they should. A different situation would be here if we could fairly say in the light of the whole record that the purpose had been left at large, without identifying token. There would then be room for argument that demand should have been made for an explanatory ruling. Here the course of the trial put the defendant off his guard. The testimony was received by the trial judge and offered by the Government with the plain understanding that it was to be used for an illegitimate purpose, gravely prejudicial. A trial becomes unfair if testimony thus accepted may be used in an appellate court as though admitted for a different purpose, unavowed and unsuspected. . . Such at all events is the result when the purpose in reserve is so obscure and artificial that it would be unlikely to occur to the minds of uninstructed jurors, and even if it did, would be swallowed up and lost in the one that was disclosed."

*Shepard v. United States,* 290 U.S. 96, 102–03, 54 S.Ct. 22, 25, 78 L.Ed. 196 (1933). As already explained, the government's consistent position at trial was that Spinelli was, in fact, relating only his own out-of-court statements, and not Cali's, and that, although the hearsay rule admittedly did bar Spinelli from relating Cali's out-of-court statements, Spinelli could testify as to his own out-of-court statements, those statements being admissible under some supposed exclusion from the definition of hearsay or some purported exception permitting introduction of the prior statements of a witness who testifies at trial who can be subjected to cross-examination as to those out-of-court statements. With the exception of one isolated and confusing statement by the prosecutor, to which we attach absolutely no significance,[43] the only

---

**43.** At only one brief point during the trial did the government suggest in any way that Spinelli's extensive testimony regarding his conversations with Cali might be admissible for a more restricted purpose than for proving the truth of the matters asserted. Specifically, prior to the beginning of the second full day of trial, at a point when most of the challenged portions of Spinelli's testimony had already been heard, the prosecutor suggested:

> Therefore, we could justify having Detective Spinelli testify as to what Mr. Cali said to Mr. Check on two theories. Number 1, an agency theory, and that is Mr. Cali was Mr. Check's agent for the purpose of narcotics. The second is that these are verbal acts, and that in order for the jury to understand what was going on, you can't just have a person testify as to one end of a conversation in a vacuum. However, to even avoid that problem, the government has taken the conservative method in order to avoid any evidentiary problem, and therefore we have always phrased our questions in terms of just tell us

what you said to him, not what he said to you, which I do believe is a question asked universally throughout this courthouse in almost every case to avoid a hearsay objection. I believe a person is entitled to testify as to what he said. (Tr. at 139.)

We note first of all that the passage makes sense only if the phrase "what Mr. Cali said to Mr. Check" in the first sentence is taken to be "what Mr. Cali said to Detective Spinelli." Although at first blush it would appear that the prosecutor was advancing at trial one of the same theories of limited admissibility he now suggests on appeal, we find that under the circumstances it would be grossly unfair to Check for us to attach any weight to the prosecutor's allusion to the "verbal acts" doctrine. First of all, it seems that the prosecutor himself did not understand the doctrine he was attempting to explain to the judge, for when he stated "that in order for the jury to understand what was going on, you can't just have a person testify as to one end of a conversation in a vacuum," the prosecutor was actually referring

purpose for which the defense could reasonably have believed Spinelli's testimony regarding his conversations with Cali was being offered and received was to prove the truth of the matters asserted therein. That broader purpose was an impermissible one. Following *Shepard,* we therefore hold that under the circumstances here it would be unfair to consider the admissibility of the evidence for any narrower purpose than that upon which the testimony was unquestionably offered and received at trial.

Plainly, Check was prejudiced by the government's unabashed use of Spinelli's transparent incorporation of Cali's hearsay statements. Perhaps the most troubling aspect of Spinelli's conveying to the jury the substance, indeed, the minutiae, of the information Cali conveyed to him is the sheer extent of the inadmissible material to which the jury was exposed. This is not a case in which the defendant-appellant seeks reversal of his convictions on the basis of one or two inconsequential pieces of hearsay, perhaps inadvertently elicited by the government. On the contrary, Spinelli's hearsay testimony was deliberately elicited, it was extensive, and, prior to the introduction of the admissible portions of Spinelli's testimony, the inadmissible hearsay had already graphically portrayed Check as a despicable character, a corrupt police officer who was also an experienced peddler of hard drugs. Thus, as already mentioned, the jury learned from Spinelli's testimony about his conversations with Cali that Check was apparently no novice at dealing in drugs and that, among other things, Check's involvement in drug peddling was so extensive that he had regular suppliers for both cocaine and heroin, that one source of supply for some cocaine that was "70 percent

pure" was a "captain of detectives" and that Check was capable of selling high-quality cocaine and heroin. So, too, the jury heard that Check demanded substantial sums of money for the drugs he was pushing and that Check demonstrated that he was "street smart" by demanding that the purchaser "front" the money for the narcotics. Nor do we think the jury was unimpressed by Check's remarks to Cali, transmitted to the jury through Spinelli's inadmissible testimony, that Check was very apprehensive about "rats" and about "being busted by the man" and that, because of these concerns, Check was not particularly interested in selling narcotics to anyone whom he did not know. Exacerbating the prejudice to Check is the fact that, in a particularly insidious manner, the improper admission of Spinelli's hearsay transformed what was essentially a simple "swearing contest," *Taylor v. Kentucky,* 436 U.S. 478, 98 S.Ct. 1930, 1936, 56 L.Ed.2d 468 (1978), between Spinelli and Check into a trial at which Check's version of what had transpired was now contradicted by the "testimony" of two witnesses, one of whom could not be subjected to cross-examination at trial. Thus, by incorporating Cali's hearsay into Spinelli's testimony, the government received the benefit of having, in effect, an additional witness against Check while simultaneously insulating from cross-examination that witness, a witness whom we can safely assume would have been subjected to a scathing, and perhaps effective, cross-examination by defense counsel. It is, we should add, not a satisfactory answer to say that Check could have called Cali as his own witness. *See United States v. Oates,* 560 F.2d 45, 82 n.39 (2d Cir. 1977). To be

in a very general way to the so-called doctrine of verbal completeness, rather than to the verbal acts doctrine. Thus, he not only failed to give any explanation of the verbal acts doctrine, but he actually gave a fallacious explanation of that principle. Moreover, the doctrine which the prosecutor vaguely discussed, that of verbal completeness, would be of absolutely no assistance to the government here if, as the prosecutor claimed the government had the right to do, the government wished to introduce testimony regarding what Cali had said to

Spinelli. Cali's otherwise inadmissible hearsay statements to Spinelli could be admitted on a completeness theory only for the limited purpose of explaining and putting in context Spinelli's previously admitted, *and admissible,* statements to Cali but, as we have already held, Spinelli's statements themselves were inadmissible. Therefore, Cali's statements to Spinelli, their admissibility for limited purposes being entirely dependent upon the prior admissibility of Spinelli's statements to Cali, would be inadmissible.

sure, the prejudice to Check is somewhat alleviated by the fact that much of the information Cali conveyed to Spinelli was subsequently given by Check to Spinelli once the two men had been introduced and had commenced face-to-face negotiations for the sale of narcotics. Nevertheless, while the prejudice was ameliorated it was not eliminated, for, as previously discussed, the hearsay was extensive, and it tended to condition the jurors in advance of their hearing any *admissible* testimony, to believe Check to be a genuinely reprehensible character. Moreover, and most importantly, it effectively provided the government with a witness against Check who could, in effect, corroborate Spinelli's story without having to suffer the indignity of being exposed personally to the aggressive cross-examination which surely would have been mounted against him.[44]

■ We must now decide whether the prejudice resulting to Check requires reversal of his convictions. It seems fairly clear that there was sufficient evidence, apart from Spinelli's hearsay testimony, upon which the jury could have convicted Check on each count of the indictment here. However, as we said in *United States v. Ruffin*, 575 F.2d 346, 358–59 (2d Cir. 1978), "the test of whether an error is harmless is *not* whether, on the required review of the entire record, *Kotteakos v. United States,* . . . 328 U.S. at 762, 764, 66 S.Ct. 1239, the appellate court believes that, disregarding the erroneously introduced evi-

dence, there was other evidence which was independently sufficient to establish the defendant's guilt. Instead the standard involves an analysis of the manner in which, in the total setting of the case, the error influenced the jury." And we also said in *Ruffin* at 360, quoting from *Kotteakos v. United States,* 328 U.S. 750, 764, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), that "Only if 'our conviction is sure that the error did not influence the jury or had but very slight effect,'" can Check's convictions be affirmed. For the reasons we have already discussed in depth, the jury may well have been influenced against Check by the extensive inadmissible portions of Spinelli's testimony. We thus conclude that, inasmuch as we are not sure that the error did not influence the jury or that it had but a very slight effect, the error was not harmless. So we hold that Check's convictions must be reversed. We find reversal also appropriate here because an affirmance would perhaps provide an invitation to the government, which for many justifiable reasons may choose not to produce an informer, further to disadvantage defendants by having the informer's hearsay testimony seep into the record through the testimony of an undercover police officer, without the defendant's being able to subject the informer's hearsay testimony to the rigors of cross-examination.

■ Although we predicate our reversal of Check's convictions here solely on the

---

**44.** Indeed, during his cross-examination of Spinelli defense counsel did attempt to provide the jury with some idea about Cali's credibility. For instance, Check's attorney asked Spinelli: "By the way, did you know that the confidential informant Cali was under psychiatric care at the time he was—." Tr. at 221–37. When defense counsel pursued this general line of inquiry by asking Spinelli whether he had been advised that Cali "was facing a serious criminal charge in the state court in about that time," *Id.* at 221–37, the prosecutor vehemently objected to defense counsel's attempt so to discredit Cali:

> Your Honor, counsel is using a technique to discredit the informant through this witness. I respectfully submit that he knows the technique that is proper. The proper technique is for him to call the informant and ask him this if he wants to do so. He is

available, but to use this witness for that purpose is an improper technique in cross-examination. (*Id.* at 221–37.)

Understandably, in view of the technique employed by the prosecutor in conveying to the jury Cali's inadmissible hearsay, Check's attorney responded that the prosecutor was displaying "unmitigated gall" by making such objection:

> I think the Assistant United States Attorney has unmitigated gall in making that objection at this point since he's used this witness to get at the complete testimony of the undercover, of the confidential informant without calling him. (*Id.* at 221–38.)

Contrary to the prosecutor's explication of the law of evidence, the impeachment technique being employed by defense counsel was entirely proper. *See* Fed.R.Evid. 806.

erroneous introduction of the extensive hearsay portions of Spinelli's testimony, we believe, as it is likely that this case may be retried, that it is also appropriate to comment briefly on the government's use of "death threat" testimony.[45] Check argues that the district court erred by allowing Spinelli to testify on his direct examination that Check said "that if he had any problems with anyone he wouldn't hesitate to shoot them." While we need not, and thus do not, decide the issue, Check's argument is surely a substantial one. The government asserts that the statement was relevant to show intent and consciousness of guilt. Assuming arguendo that this is so, it does not end the inquiry, for evidence, though relevant, may sometimes have to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice [to the defendant]." Fed.R.Evid. 403. To be sure, we have held that performance of the balancing test which must be employed here is principally the responsibility of the district court and, upon appeal, the lower court's determination in this regard will be sustained unless there has been an abuse of discretion. *E. g., United States v. Cheung Kin Ping,* 555 F.2d 1069, 1074–75 (2d Cir. 1977). Yet, it is equally true that we have previously recognized that severe prejudice can result from the use of death threat testimony and, accordingly, we have carefully limited that use to situations where there was a clear need for the prosecution to use such evidence.

Thus, for instance, in *United States v. Panebianco,* 543 F.2d 447 (2d Cir. 1976), *cert. denied,* 429 U.S. 1103, 97 S.Ct. 1128, 51 L.Ed.2d 553 (1977), "[d]uring direct examination the prosecutor [had] carefully steered Mobley away from mentioning any threats." *Id.* at 454. But on cross-examination, when asked by defense counsel whether she had planted heroin on her employer, the witness Mobley replied that she had in fact done so, mentioning "[i]n the course of her response . . . that a threat had been made to her by the Rizzos and [her employer]." *Id.* at 454–55. On redirect examination the prosecutor sought to clarify exactly what had happened, and the witness testified that the defendants had ordered her employer to kill her and that, by having her employer arrested, she had sought to avert her own murder. In upholding the district court's admission of this testimony, we held that "where cross-examination has been used to elicit an incomplete picture which gives a distorted impression of a witness's credibility, the prosecution should generally be allowed to set the record straight on redirect. For example, this court has repeatedly held that a witness should be permitted to explain that a previous failure to implicate the defendant was due to a death threat." *Id.* at 455. So, too, in *United States v. Cirillo,* 468 F.2d 1233 (2d Cir. 1972), *cert. denied,* 410 U.S. 989, 93 S.Ct. 1501, 36 L.Ed.2d 188 (1973), the government, under comprehensive cautionary instructions, was permitted to elicit testimony on redirect that the witness's failure at her early interview by narcotics officers to provide the agents with a complete statement, a deficiency raised during defense counsel's cross-examination of the witness, was due to the fact that the defendant had threatened to kill her if she provided any information to the authorities. Thus, there also, the government, in eliciting death threat testimony, was responding to an issue already broached by the defendant. Somewhat similar circumstances existed in *United States v. Malizia,* 503 F.2d 578 (2d Cir. 1974), *cert. denied,* 420 U.S. 912, 95 S.Ct. 834, 42 L.Ed.2d 843 (1975), in which the government wished to elicit testimony that the reason their informant was not testifying at trial was that the defendant had threatened to kill him. The district judge, "outside of the jury's presence, indicated to the defendant's counsel that if he did not intend to comment adversely on the Government's failure to produce the informant, the testimony as to the reason for the failure of the witness to appear would be excluded. Instead of accepting this suggestion, counsel replied that he would raise the

**45.** By not objecting during the prosecutor's opening statement or at the point during Spinelli's direct examination when the specific death threat was elicited, *see* Tr. at 194, Check has, in any event, not properly preserved this issue for appeal here.

question in his summation in the context of the Government's failure to sustain 'its burden of producing all witnesses.'" *Id.* at 580. While implying that the admission of the death threat testimony in that case may have been erroneous, we nonetheless refused to reverse the convictions inasmuch as the evidence of the defendant's guilt was strong and the defendant had "had an opportunity to exclude the testimony but he rejected that option and chose instead to exploit the absence of the witness." *Id.* at 581.

Attempting to fit the facts here within the mold of *Malizia, Panebianco* and *Cirillo,* the government argues that Spinelli's death threat testimony was offered generally in response to the defendant's attack on Spinelli's credibility, launched during Check's opening statement and pursued in summation, and offered specifically to answer Check's argument that Spinelli's version of his unrecorded conversations with Check should not be believed inasmuch as Spinelli, who could have recorded those conversations, had failed to do so. The problem with the government's position in this regard is that the record clearly demonstrates that the government was not, in fact, *responding* to a previously raised defense argument that Spinelli should be disbelieved because he refused to wear his recorder. In fact, before defense counsel had said anything at trial, the government had already committed itself to the production of the death threat testimony. Specifically, in his opening statement to the jury, the prosecutor stated: "And you will hear that Sandy Check told Danny Gennaro that if there were any problems with any of this, someone was going to get killed." Tr. at 51. Here, the death threat testimony was elicited on Spinelli's direct examination, and the

defense as yet had not specifically raised the issue of Spinelli's failure to wear a recording device. It is thus apparent that the circumstances here are distinguishable from those existing in *Malizia, Panebianco* and *Cirillo,* in each of which the defense clearly invited the government to introduce the death threat testimony.

Judgment of conviction reversed and case remanded for a new trial on all counts of the indictment.[46]

---

**46.** In addition to his persuasive arguments that substantial portions of Spinelli's testimony were inadmissible hearsay and that the death threat testimony prejudiced his right to a fair trial, Check also contends, on the basis of a somewhat fanciful theory, that his conspiracy conviction must be reversed inasmuch as there was insufficient evidence to support that particular charge. It suffices to say that the evidence in this case was sufficient to support

that conviction. In particular, Check's own admissions to Spinelli regarding both Check's utilization of a runner and his business dealings with heroin and cocaine suppliers would have provided an ample enough evidentiary basis to support the conspiracy conviction if the government had not invited a reversal of all Check's convictions by employing so extensively Spinelli's inadmissible and prejudicial hearsay testimony.