The dismissal of the complaint by the district court is affirmed.

**UNITED STATES of America, Appellee,**

v.

**Irwin A. SCHIFF, Appellant.**

**No. 49, Docket 79–1139.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 12, 1979.

Decided Dec. 12, 1979.

---

Douglas Gilmore, Westport, Conn. (Raymond W. Ganim, Stratford, Conn., of counsel), for appellant.

Richard Blumenthal, U.S. Atty., D. Connecticut, New Haven, Conn. (Michael Hartmere, Asst. U.S. Atty., New Haven, Conn., of counsel), for appellee.

Before LUMBARD, FRIENDLY and GURFEIN, Circuit Judges.

GURFEIN, Circuit Judge:

This case raises an issue never before considered in a federal court of appeals: the question of the admissibility in evidence in a jury trial on a criminal information of the videotape of a "talk show" which includes the opinions of unsworn strangers on the very issues before the jury. Appellant Irwin A. Schiff, a self-proclaimed iconoclast in the field of federal income taxation, and a prolix writer and lecturer on the subject of money, appeals from his conviction for willful failure to file personal income tax returns for the years 1974 and 1975. On April 18, 1978, a two-count information was filed against Schiff in the United States District Court for the District of Connecticut. The information charged Schiff with

willful failure to file personal income tax returns in violation of 26 U.S.C. § 7203 for the calendar years 1974 and 1975.[1] After a trial before District Judge Daly and a jury, Schiff was found guilty on both counts. He was not charged with tax evasion, or obstruction of the Government in its efforts to collect taxes, omissions which will become material in the later discussions of relevancy.[2]

The principal claim on appeal is that the prosecution offered and the trial judge erroneously allowed in evidence, over objection, a videotape of Schiff's appearance on April 12, 1978 on Tom Snyder's NBC talk show "The Tomorrow Show" with Snyder and another guest.

We have viewed the videotape, as did the jury, and conclude that its admission was prejudicial and prevented Schiff from getting a fair trial. To understand why the United States Attorney should not have offered the videotape and why the judge should have refused to admit it we must describe the scene and define the issue.

Appellant was in the insurance business. He also fancied himself a "constitutionalist", an extremist who reserved the right to interpret the decisions of the Supreme Court as he read them from his layman's point of view regardless of and oblivious to the interpretations of the judiciary. One can describe his attitude either as contumacious of governmental authority for the purpose of advancing the common weal, or as that of a clever faker who used his own distortions of the Constitution as a flimsy excuse for failing to pay his income taxes.

In 1968 Schiff testified before the Senate Committee on Banking and Currency, regis-

---

**1.** 26 U.S.C. § 7203 provides:

Any person required under this title to pay any estimated tax or tax, or required by this title or by regulations made under authority thereof to make a return (other than a return required under authority of section 6015 or section 6016), keep any records, or supply any information, who willfully fails to pay such estimated tax or tax, make such return, keep such records, or supply such information, at the time or times required by law or regulations, shall, in addition to other penal-

ties provided by law, be guilty of a misdemeanor and, upon conviction thereof, shall be fined *not more than $10,000, or impris-oned not more than 1 year,* or both, together with the costs of prosecution.

**2.** On March 29, 1979 he was sentenced on each count to concurrent one year terms of imprisonment, with execution of sentence suspended after six months, six months probation, a fine of $10,000 and a special condition that probation would terminate upon payment of the fine.

tering his opposition to the removal of gold backing from Federal Reserve Notes. He .wrote a book, first published in 1976, entitled *The Biggest Con: How the Government is Fleecing You*. The book includes such chapters as "U. S. Taxes—How They Have Converted the American Worker into a Serf" and "Taxes: The Arsenic in Our System." Schiff's views on taxation and on Social Security ("The World's Biggest Chain Letter") have appeared in other publications as well.[3] Beginning in 1977, Schiff conducted seminars on taxation.

So long as he made his attacks on the system in appearances before congressional committees, in articles in current periodicals, and even in rather evangelistic seminars on tax resistance, he was probably protected by the First Amendment. But he went further and he took his own advice literally.

Though he had filed personal income tax returns through 1973, disclosing his income, he decided for the calendar years 1974 and 1975 to file a "return" on the printed form 1040, but without disclosure of his gross income.

Accordingly, for each of these years, Schiff sent to the IRS a Form 1040, but on each form the title was altered to read "U.S. Individual Income Confession." Neither form contained any income data whatever. Instead, the various boxes were filled with assertions of assorted constitutional rights. Each form opened with the statement: "The 16th Amendment giving Congress the right to 'collect taxes on income' in no way abolished the rights secured to me by the 4th, 5th, 6th, 7th, 8th, 9th, 10th & 13th (I will not be an involuntary serf of the Federal Government) . . . ." In the signature box at the end of each form appeared the statement, "FOR SHAME ! The I.R.S. is asking me to cast aside basic constitutional safeguards which as a patriotic citizen wishing to uphold and preserve the Constitution—I cannot do."

The 1974 submission was accompanied by a 36-page statement of alleged illegal and unconstitutional acts of the federal government with exhibits marked A through T. Schiff charged, *inter alia*, that the Government was guilty of illegally operating the Social Security "chain letter," counterfeiting coin in violation of article 1, section 8 of the Constitution, imposing involuntary servitude by means of an income tax and imposing an unauthorized tax by promoting inflation. The 1975 submission was accompanied by similar allegations.

Schiff's basic themes apparently were that Federal Reserve Notes are merely promises to pay since they were no longer required to be backed by any statutory gold reserve and that they are, hence, not "income"; and that the Sixteenth Amendment which permits the United States to lay a tax on income permits the Government only to tell him how much he owes but does not require him to compute the tax himself, with the corollary that compelling him to do so compels him to be a witness against himself in violation of the Fifth Amendment privilege against self-incrimination.

In 1976 Schiff filed Amended U.S. Individual Returns (Form 1040x) for the relevant years. The Amended Returns stated that Schiff could not compute and warrant the accuracy of the 1040s because he could not understand the complicated internal revenue laws and that "a law that is incomprehensible is invalid, unconstitutional and uninforceable [sic]." In 1977, he submitted additional 1040s for 1974 and 1975. He labeled each of these forms "PETITION FOR REDRESS OF GRIEVANCES" and stated on the forms, "I offer to amend or file again if you can show me how to do so without waiving my constitutional rights."

Each of these forms was accompanied by 100 pages of attachments consisting primarily of correspondence between Schiff and

**3.** A reprint of an article by Schiff, entitled "The Biggest Con" and printed in *Argosy* appears in the *Congressional Record*, 94th Cong., 2d Sess., 122 CONG. REC. E4643–4645 (August 25, 1976). An interview of Schiff by the *Wash-* *ington Star* regarding his views on Social Security is reprinted in the *Congressional Record*, 95th Cong., 1st Sess., 123 CONG. REC. S 19506–507 (December 15, 1977).

the Board of Governors of the Federal Reserve System as well as other federal agencies.

### The Trial

The defense did not seriously contend that the conglomeration of papers filed along with the almost blank 1040 form constituted the tax return required by law. Instead appellant argued that he could not constitutionally be compelled to file a return disclosing his income (which by his dialectic regarding bank notes never did become income) because of his privilege not to be a witness against himself in any event. Relying upon his own gloss on case law like *United States v. Sullivan*, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927),[4] he asked the jury to find that his conduct was not willful in the criminal sense but was rather a good faith effort on his part to restore the Constitution to its rightful place.

There was no dispute that the defendant's wholly owned corporation, Irwin A. Schiff, Incorporated, filed corporate income tax returns for the years preceding 1974 and thereafter, and that the returns disclosed that the defendant had received, in 1974 and 1975, salary in the sum of Fifteen Thousand Six Hundred Dollars ($15,600), a sum sufficient to require the filing of a personal income tax return. 26 U.S.C. § 6012. The prosecution did not have to prove on this indictment that the defendant had any net income.

The case then was not one in which the defendant had failed to file any return that would alert the Government to his existence. This was a case where the Government was prosecuting criminally a person who disclosed his name and address, but who filed a form that was clearly inadequate under the statute and regulations. *United States v. Johnson*, 577 F.2d 1304, 1311 (5th Cir. 1978); *United States v. Jor-*

dan, 508 F.2d 750 (7th Cir.), *cert. denied*, 423 U.S. 842, 96 S.Ct. 76, 46 L.Ed.2d 62 (1975); *United States v. Daly*, 481 F.2d 28 (8th Cir.), *cert. denied*, 414 U.S. 1064, 94 S.Ct. 571, 38 L.Ed.2d 469 (1973); *United States v. Porth*, 426 F.2d 519 (10th Cir.), *cert. denied*, 400 U.S. 824, 91 S.Ct. 47, 27 L.Ed.2d 53 (1974).

Judge Daly knew that the issue for the jury was narrow: whether Schiff had acted in reasonable good faith. As he later charged the jury, income received in Federal Reserve Notes is taxable income under the law and "a taxpayer's return [which] does not contain any information relating to the taxpayer's income from which the tax could be computed, is not a return within the meaning of the law." The judge also charged that the Fifth Amendment does not give a person the right to withhold the required information on the return concerning items the disclosure of which would not incriminate him or tend to incriminate him, and that even as to items which might incriminate him, he is required to state the *amount* of his income even if he does not reveal its illegal source. *See United States v. Johnson, supra*, 577 F.2d at 1311; *United States v. Egan*, 459 F.2d 997, 998 (2d Cir.), *cert. denied*, 409 U.S. 875, 93 S.Ct. 123, 34 L.Ed.2d 127 (1972). These instructions disposed of much of the case, however the issue of willfulness had to be left to the jury. *Cf. Morissette v. United States*, 342 U.S. 246, 275, 72 S.Ct. 240, 96 L.Ed. 288 (1952) (charge of "presumptive intent" was error); *United States v. Murdock*, 290 U.S. 389, 393–94, 54 S.Ct. 223, 78 L.Ed. 381 (1933) (judge erred in expressing to the jury his opinion that the government had met its burden in proving willful failure to provide information regarding tax returns).

In a prosecution under § 7203, the Government need not produce direct evidence to show guilty intent; willfulness

---

**4.** In *United States v. Sullivan, supra*, the Supreme Court held that income derived from business in violation of the National Prohibition Act was subject to taxation. Justice Holmes, writing for the Court, stated that the defendant could have exercised his Fifth Amendment

right with respect to particular questions on the return, but could not "draw a conjurer's circle around the whole matter by his own declaration that to write any word upon the government blank would bring him into danger of the law." *Id.* at 264, 47 S.Ct. at 608.

may be shown by means of circumstantial evidence alone. *United States v. MacLeod,* 436 F.2d 947, 949 (8th Cir.), *cert. denied,* 402 U.S. 907, 91 S.Ct. 1378, 28 L.Ed.2d 647 (1971). *See also* 10 Mertens, Law of Federal Income Taxation § 55A.09 (3d ed.). In this case, the prosecution offered evidence that when Schiff's accountant reminded him of his obligation to file a personal income tax return for the calendar year 1974 the defendant objected to the preparation of the return and requested the accountant to voice the constitutional objections to the IRS, and that the accountant declined to do so. In addition, the Government showed that the defendant had filed corporate income tax returns for 1974 and 1975, that he had filed personal income tax returns for years prior to 1974, and that he had received income in 1974 and 1975. The Government also demonstrated that the defendant filed no return at all for 1977, and offered credible evidence that notices of failure to file in 1974 and 1975 had been mailed to Schiff.[5] Furthermore, Schiff, in his purported return, stated that for personal reasons he had found it inconvenient to keep any clear records of his finances for the years in question.

■ There was, accordingly, sufficient evidence of willfulness. *See United States v. MacLeod, supra,* 436 F.2d at 950; *United States v. Browney,* 421 F.2d 48, 50 (4th Cir. 1970). *Cf. United States v. Magnus,* 365 F.2d 1007, 1011 (2d Cir. 1966), *cert. denied,* 386 U.S. 909, 87 S.Ct. 856, 17 L.Ed.2d 783 (1967) (prior taxpaying history probative of willfulness).

Before the close of the prosecution case, therefore, the jury had heard testimony that the defendant was required to file a return showing his income, that he failed to do so for several consecutive years, and that his only excuse was, as developed in his statements attached to the 1040 forms in evidence, that the Government was wrong in requiring him to state his income. It was evident that the only defense left to the defendant was an assertion of his good faith.[6]

At this point, as part of its direct case, the Government offered in evidence a videotape of Schiff's appearance on April 12, 1978 on NBC's "The Tomorrow Show." The April 12 appearance was the second by Schiff; he had appeared several weeks earlier as the only guest on the show and was invited to return after overwhelming viewer response.[7]

Testimony by a Government witness showed that on April 3, 1978 the producer of the show had telephoned Scott Waffle, an IRS Public Affairs official, and invited the IRS Commissioner to appear with Schiff on the television show. The Commissioner declined the invitation but the IRS provided the show instead with several Media Relations fact sheets regarding tax protesters, including one general fact sheet and one on constitution-based protests. The fact sheets apparently were not prepared specifically for the show but did reflect the views of the IRS. They were used by Snyder in his "talk" with Schiff.

---

5. Although the Government contended that computer-generated notices that stated "Amended Return Filed—No Original" were sent to Schiff in 1975 and 1976, Schiff testified that it was not until 1977 that he received letters notifying him that his purported "returns" had been received but were legally inadequate.

6. The judge ultimately charged:

Even if you find that the defendant erroneously claimed his Fifth Amendment privilege, his conduct is not willful if you find that he acted in accordance with a good faith understanding of the law, based upon, among other things, a good faith reliance on judicial decisions of the federal courts or a good faith belief that the documents filed for the taxable

years 1974 and 1975 constituted in each case an income tax return. The defendant's views need not be legally correct, just as long as he honestly believed and acted upon them in good faith.

*See United States v. Johnson, supra,* 577 F.2d at 1312.

The judge noted also that "the only bad purpose necessary for the Government to prove in this case is the deliberate intention not to file returns *which the defendant knew ought to be filed* " (emphasis added).

7. In his opening introductions, Snyder stated to Schiff, "As I say, Irwin, your visit here two weeks ago set off one of the biggest viewer responses we have ever had in this program."

In addition, the IRS videotaped the broadcast, and it is this videotape that was received in evidence.

On the April 12th show, Schiff shared the spotlight with the other guest, James Schnake. The host, Tom Snyder, introduced Schnake as a trial attorney specializing in civil and criminal fraud cases, and as a former chief of the criminal division of the United States Attorney's Office in Northern California. According to Snyder, Schnake was responsible for the prosecution of all criminal IRS cases in Northern California from 1957 through 1961.

In introducing the videotape prepared by the IRS, the Government did not contend that the statements made by Snyder and Schnake were relevant, but sought admission of the tape in its entirety solely for the purpose of showing Schiff's *responses.*

The defense objected to admission of the tape on the grounds of unfair prejudice and lack of authentication. The judge listened to the tape and then admitted it over these objections. Judge Daly summarized his position as follows: "Since the tape is offered for the statements made thereon by the defendant, and since I will charge the jury they may not consider it for any other purpose, it seems to me that a fair trial will not be imperilled by the admission of the tape." In addition, the court overruled the objection based on the alleged failure to authenticate, noting that there was no indication that IRS had altered the tape, though, in fact, the objection was based on a different ground—a failure to show completeness; the show had been prerecorded the night before it was broadcast and there was no proof that the IRS copy taken from the broadcast was not an already edited version of the actual prerecorded tape.[8]

At the close of the Government's case, the defense moved for a judgment of ac-quittal on the ground that the Government had not met its burden with respect to willfulness. The defense argued that no evidence of willfulness had been presented other than the videotape and that a 1978 videotape could not establish the existence of the requisite state of mind in the relevant period, 1974–1976. The District Court denied the motion, stating that there was ample evidence of intent, independent of the tape, to go to the jury. As we have indicated, we agree.[9]

### *"The Tomorrow Show" Videotape and Unfair Prejudice*

Counsel have called our attention to no case in which a talk show on television involving a defendant has been allowed as evidence in a criminal case. We must now consider whether there was any legitimate purpose for its admission, and whether, if it was relevant, the statements made by the participants were not only inadmissible hearsay but also irreparably prejudiced the defendant on the sole issue left to the jury—his good faith as a defense to the charge of willfulness.

Obviously putting a dialogue on tape does not make it less subject to the Rules of Evidence. In the normal course of testimony with respect to admissions by a party, there is a witness on the stand whose other testimony and opinion are limited by the rules of relevance and competence and, in the case of expert opinion, by the usual tests of expert qualification. Even when a witness testifies that certain statements were adopted by the defendant, his testimony will normally be limited to those particular statements which it is asserted were adopted. It will not provide sanction for irrelevant or incompetent evidence. Here the television "witnesses" were neither sworn nor qualified as experts.

---

**8.** Schiff admitted at trial that the tape, to the best of his recollection, was a "fair and actual portrayal of what [he] said on that night," but also noted that the show had been taped and rebroadcast, that there is an editor of the show, and that he couldn't say with "actual certainty" whether the videotape included "everything."

**9.** The defense renewed its objections to the videotape at the close of the trial by means of alternate motions for a new trial or judgment of acquittal. The court emphasized that there had been no suggestion of Government impropriety in the preparation of the tape. Both motions were denied.

The threshold question is what the prosecution hoped the statements of Schiff on the videotape proved—in essence a test of relevancy. On appeal the Government asserts as justification that the jury was told that statements by Snyder and Schnake were to be considered "only for the fact that they were made, and that the defendant 'had certain responses or reactions.'" The Government stresses, moreover, that the court emphasized that "the reactions and responses themselves should be taken into account only if the jury concluded that any of them were relevant to the issue of intent."

One would have supposed that the prosecution would be able to point to particular responses by Schiff which could be categorized as admissions against interest on the issue of whether he really believed the legal arguments which he had addressed to the IRS. We have been pointed to no such admissions. On the contrary, the Government curiously points to the compatibility, rather than to the incompatibility, of appellant's statements on the television show with his statements on his "returns" as emphasizing rather the *consistency* of his beliefs and actions.

The television show was broadcast on April 12, 1978, two years after the last date on which the failure to file the 1975 return would have become a crime.[10] If considered nevertheless as a warning to *cure* an alleged criminal omission as evidence of good faith, the broadcast occurred only six days before the information was filed against appellant on April 18, 1978—hardly enough time to permit the taxpayer to change his return based on the purported warnings.

We find no relevance on the grounds tendered by the Government, admissions against interest and warnings. Whether there was relevance in any part of Schiff's statements should have been determined by the judge and explained to the jury. Relevance is for the judge, not the jury. IX Wigmore on Evidence § 2550 (3d ed.). "Evidence which is not relevant is not admissible." Fed.R.Evid. 402.

Assuming however that some slight relevance can be found in some of Schiff's statements, we would not necessarily reverse because some irrelevant material was also received.

We reverse here because even if there was a minimal relevance, Rule 402, the prejudice so far outweighed it as to compel reversal. Under Rule 403, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ."

The balancing process required by Rule 403 is entrusted, in the first instance, to the trial judge, *see* 1 Weinstein's Evidence § 403[02], and we have held that the trial judge's discretion should not be disturbed lightly. In *United States v. Robinson,* 560 F.2d 507 (2d Cir. 1977) (en banc), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978), we stated that "the preferable rule is to uphold the trial judge's exercise of discretion unless he acts arbitrarily or irrationally." 560 F.2d at 515. *See also United States v. Hernandez,* 588 F.2d 346 (2d Cir. 1978); *United States v. Rucker,* 586 F.2d 899 (2d Cir. 1978); *United States v. Lord,* 565 F.2d 831 (2d Cir. 1977). In this case we have viewed the evidence represented by the videotape with our own eyes, and can judge the likely prejudice resulting from it as well as the trial judge. The test for exclusion under Rule 403 is that the danger of *unfair* prejudice outweighs the probative value of the evidence, and that test is clearly met in this case.

The strident tone of the broadcast as enunciated by Snyder and the "tax expert" emphasized that appellant Schiff could not possibly believe his own arguments, the very issue left for the jury. *Cf. Apicella v.*

---

10. In *United States v. Bourque,* 541 F.2d 290, 294 (1st Cir. 1976), the court noted:

Just as subsequent conduct cannot relieve a taxpayer from criminal liability for failure to file tax returns on or before their due date [citations omitted] we do not think that subsequent events can transform an act of omission, innocent when it occurred, into a criminal act.

*McNeil Laboratories,* 66 F.R.D. 78, 86 (E.D. N.Y.1975) (emphasizing potential unfair prejudice in admitting magazine article which dealt precisely with question that would be before the jury). These talk show adversaries predicted with assurance that on the facts known to them (the filing of "returns" which were not returns) appellant deserved to be convicted and, indeed, would certainly be convicted by any jury.

Toward the beginning of the broadcast, for example, Snyder stated to Schiff, "You know, you're going to wind up in Leavenworth one day, and you're going to wonder what the hell hit you"; and "We're here— you are here advising people to break the law," to which Schnake added, "I'm convinced he is." Of similar import is the following passage later in the show:

> Snyder: You're going to jail—do you know that?
>
> Schiff: Here's what—here's what it's— no I'm not.
>
> Snyder: You are going to jail.
>
> Schiff: I'm not going. I'm not going. This is what—it is what—listen to what the Supreme Court—
>
> Snyder: Do you think he's going to jail?
>
> Schnake: Yes—I think he is asking to go to jail and I think he's going to make it.[11]

When Schiff offered the argument that United States notes have not been "money" since the gold backing was abandoned, Schnake stated that "[m]en have gone to jail for espousing" that view.

11. The patent outshouting of Schiff, not giving him a chance to finish a sentence, was typical of much of the tape. *Compare United States v. Allison,* 474 F.2d 286, 287 (5th Cir. 1973), *cert. denied,* 419 U.S. 851, 95 S.Ct. 91, 42 L.Ed.2d 82 (1974), where the defendant "[i]n rapid-fire fashion . . . was several times asked complex, multifaceted questions . . . but was not given time to answer."

12. Towards the end of the show, both Schnake and Snyder expressed concern that Schiff would lead others to violate the law: .
> Schnake: It is clear [Schiff] is advising people to violate the law in a most disastrous area . . .
> Snyder: I don't want people watching the show [word unclear] to go to jail—simply do

Appellant was accused of a separate crime of practicing law without a license and, by clear implication, of obstructing the IRS in its collection of the revenue by his lectures to the taxpaying public.[12] Schiff was charged with neither of such offenses in the case on trial, and was thus impeached by the evidence of other offenses before he even took the stand. Schnake also was permitted to give the impression that when a person fails to file a return for three consecutive years, his willfulness is proved.

Thus, in addition to testifying with regard to Schiff's ultimate guilt, Schnake specifically addressed his comments to Schiff's good faith—a key issue at the trial. He offered his comments as an experienced lawyer who had both defended and prosecuted tax cases:

> Schnake: I've prosecuted tax cases, and I've defended people in Mr. Schiff's position.
>
> Now here's the procedure. In a failure-to-file case—and the return that he filed, if he has filed these empty returns with the Fifth Amendment stuff on it, have been held time and again to be no return at all. If he's done that since 1974—so that's 1974, '75 and '76—that is the magic three years that we always waited for on a man who was determined not to file. Give him three years, because then your proof of willfulness is all neatly laid out for you.[13]

Schnake further characterized Schiff's Fifth Amendment arguments as "word games" and stated that "the playing of

> not file because they see you on television saying see—he says I don't have to—I'm not going to.
> Schnake: Yes—okay—and this man is practicing law without a license.

13. In *Morissette v. United States,* 342 U.S. 246, 275, 72 S.Ct. 240, 256, 96 L.Ed. 288 (1952), the Supreme Court warned that a presumption permitting the jury to "assume intent from an isolated fact . . . would conflict with the overriding presumption of innocence." The Court noted that "[s]uch incriminating presumptions are not to be improvised by the judiciary." Surely they should not be improvised by Schnake.

word games is good evidence of lack of good faith. That's a principle in civil and criminal cases."[14] He was also permitted to state from his own experience that once a taxpayer's conduct has been evaluated through the administrative process and a criminal information filed against him, he is so obviously guilty that juries always convict.

Schnake noted:

Juries bring in convictions on these statutes time and again—

\* \* \* \* \* \*

Since 1961, I would say [I defended] 15 [tax] cases for sure. And they ranged all the way from failure to file to tax evasion cases.

\* \* \* \* \* \*

Every—every one of these cases was either a conviction or a negotiated plea. . . . The cases, when they arrive in the hands of the U.S. Attorney are well-documented. And that's what you can do, except in the rare case.

This lesson from experience, a clearly excludable point, went a long way to destroying the presumption of innocence.

The additional vice was that when the videotape was shown to the jury the talk show people were, in effect, testifying as experts on the law of the forum. Such "expert" testimony is not admissible. *Marx & Co., Inc. v. Diners Club, Inc.*, 550 F.2d 505, 509–510 (2d Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977); *Loeb v. Hammond*, 407 F.2d 779 (7th Cir. 1968). As we said in *Diners Club*, "It is not for witnesses to instruct the jury as to applicable principles of law, but for the judge." As Professor McCormick notes, such testimony "amounts to no more than an expression of the [witness's] general belief as to how the case should be decided." McCormick on Evidence § 12 at 27.

The videotape is further replete with prejudicial statements. Schnake several times referred to Schiff's arguments as "frivolous" and stated that Schiff is "trying to be very clever" and is "not up front."

This pre-judgment of the defendant's guilt, accompanied by fervid commentary that conveyed an air of incontestable truth, was presented to the jury before the defendant could testify on his own behalf. By the time he took the stand his credibility had been placed on the scale in as derogatory a fashion as is conceivable. The jury saw the defendant's views mocked and discredited as incredible before he could speak for himself. *See United States v. Check*, 582 F.2d 668, 684 (2d Cir. 1978).[15]

If we ask ourselves whether a judge would have allowed their live "testimony" if Snyder and Schnake had been called as witnesses, the answer is obvious. The law of evidence, no matter how liberally construed, allows no such impermissible tactic in a case with a single issue of intent.

The only justification offered by the Government for this unorthodox approach to the law of evidence is that a cautionary instruction is sufficiently curative even in so prejudicial a situation.

We do not doubt that in most cases a jury is capable of abiding by the court's limiting instructions. But to regard "cautionary instructions as talismans for the solution of any possible prejudice problem" is tantamount to "effecting a repeal of the prejudice rule, which by its terms concedes the possibility that the negative aspects of some evidence may simply be unmanageable for the factfinder regardless of instructions." Dolan, *Rule 403: The Prejudice Rule in Evidence*, 49 So.Cal.L.Rev. 220, 248–50 (1976). As *Bruton v. United States* recognized, cautionary instructions are not always the answer. 391 U.S. 123, 135, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). *See also United States v. Check, supra*, 582 F.2d at

14. The prosecutor may have compounded the prejudice inherent in Schnake's statement of this "principle" when he echoed Schnake's language by asking, "Mr. Schiff, aren't you playing with words again?"

15. This is not, of course, to suggest that our result would be any different if the tape had been offered into evidence at a different time.

679. We do not believe that they were the answer here.

The content, timing and form of the evidence in question *combined* to create a prejudicial impact that far outweighed any conceivable probative value of the tape. We must conclude, therefore, that admission of the tape so prejudiced the defendant's case that a new trial is required.[16]

### The Evidentiary Hearing

We hold that it was not error for the trial court to refuse a pretrial evidentiary hearing on the question of Schiff's assertion of his Fifth Amendment privilege. *See United States v. Jordan, supra*, 508 F.2d at 752.

■■■ While the question of constitutional privilege is one for the judge, Schiff does not advance any theory for the validity of his claim. On appeal, the appellant emphasizes that a person filling out a tax form is a "witness" for purposes of the Fifth Amendment. Clearly, this is the rule. *See Garner v. United States*, 424 U.S. 648, 656, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1976); *United States v. Sullivan, supra*. But the Fifth Amendment privilege does not immunize all witnesses from testifying. Only those who assert as to each particular question that the answer to that question would tend to incriminate them are protected. As the Court observed in *Albertson v. Subversive Activities Control Board*, 382 U.S. 70, 79, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965), the questions in the income tax return are neutral on their face and directed to the public at large rather than to a "selective group" inherently suspect of criminal activities, *cf. Marchetti v. United States*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968) and *Grosso v. United States*, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968) (occupational and excise tax on gambling). Hence privilege may not be claimed against *all* disclosure on an income tax return.

■■■ While the judge's charge to the jury on the Fifth Amendment issue is somewhat unclear, a fair reading suggests that the judge did instruct, as a matter of law, that Schiff on his returns did not assert a proper claim of Fifth Amendment privilege.[17] The court specifically stated, "The law applicable to this case is that a taxpayer can comply with the tax laws and exercise his Fifth Amendment rights by listing the amount, not the source, of his income from illegal sources. . . ." That charge was correct.

Schiff did not list his income, nor is there any suggestion that an "illegal source" of income is involved. In fact, Schiff testified at trial that to his knowledge he had done nothing illegal during the years in question. Nor does appellant's brief suggest that there is any evidence outside the record that would have supported Schiff's exercise of a Fifth Amendment privilege if an evidentiary hearing had been held.

Finally, we note that in *Garner v. United States, supra*, the Supreme Court rejected an argument that a judicial hearing on a claim of privilege must precede a prosecution under § 7203. 424 U.S. at 664, 96 S.Ct. 1178.

The judgment of conviction is reversed and the cause is remanded for a new trial in accordance with this opinion.

---

16. In a subsequent trial, we do not preclude the cross-examination of Schiff, if he should take the stand, on statements he made on the talk show provided that improper and prejudicial statements made by Snyder and Schnake are not incorporated.

17. In response to the defendant's motion for an evidentiary hearing, the trial judge agreed that the question of constitutional privilege was one he would have to decide. However, he determined that a pre-trial hearing was not required, and suggested that there would "in effect be an evidentiary hearing to the Court which will take place contemporaneously with the trial."