506 F.Supp. 1337 (1981)
UNITED STATES ex rel. Michael BOOTHE, Petitioner,
v.
SUPERINTENDENT, WOODBOURNE CORRECTIONAL FACILITY; and Honorable Robert Abrams, Attorney General of the State of New York, Respondents.
No. 79-C-2402.
United States District Court, E. D. New York.
February 3, 1981.
*1338 Kramer, Levin, Nessen, Kamin & Soll, New York City, for petitioner; Greg A. Danilow, Lawrence S. Robbins, New York City, of counsel.
Eugene Gold, Dist. Atty., Kings County, Brooklyn, N. Y., for respondents; Dan A. Landes, Asst. Dist. Atty., Brooklyn, N. Y., of counsel.

MEMORANDUM AND ORDER
WEINSTEIN, Chief Judge.
When petitioner became obstreperous he was bound and gagged in full view of the jury. The trial judge sought to minimize prejudice by utilizing relatively inexpensive electronic equipment that would have enabled petitioner to participate in his trial from outside the courtroom. Because no *1339 funds were available the judge was precluded from exercising this discretion. Failure of the state to supply the trial court with facilities it believed were required to provide a fair trial constituted a denial of due process. Courts cannot adequately protect constitutional rights if they are denied the tools to do their job. For the reasons indicated below, petitioner's conviction must be set aside.

I. FACTS

A. Binding and Gagging in Full View of Jurors

In 1974, petitioner was tried in Kings County Supreme Court on charges arising out of a grocery store robbery. During the examination of prospective jurors, defendant, a black, voiced his objection to the prosecutor's use of his peremptory challenges to exclude blacks from the panel, an objection not unknown to the law. Cf. Swain v. Alabama, 380 U.S. 202, 222, 85 S.Ct. 824, 837, 13 L.Ed.2d 759 (1965) (upholding peremptory challenges alleged to have been made on basis of race); People v. Thompson, ___ A.D.2d ___, 435 N.Y.S.2d 739 (2d Dep't 1981) (District Attorney's exclusion of blacks voids conviction). The trial judge instructed him to be silent, but defendant later again questioned the justice of being made to go to trial before an all-white jury. At this point the court indicated that it would invoke one of the techniques for dealing with an unruly defendant discussed by the Supreme Court in Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). After the defendant repeated his objection the court recessed "to find out whether there are any facilities available in this building so that the defendant, if he continues his disruptive tactic, will be placed in that room and we will continue with this trial with some electronic units that will permit him to hear what is going on although he won't be able to see what is going on." No such facilities were available. Understandably upset, the court complained bitterly about the lack of support for the court:
We have been promised but this is the usual politician's promise nonsense that doesn't mean anything, that the Federal Government would give this court a grant of money to provide that kind of equipment. But like all of the political promises, we have nothing. There has been no such funding, no such equipment has been forthcoming and we do not have the facilities.
Reluctantly, the judge indicated that as a result of the failure to provide the necessary equipment he would "probably have to resort" to "binding and gagging" the defendant. Defense counsel objected to swearing any jurors from that panel beyond the four who had already been chosen. The defendant repeated a question about the procedure challenging jurors and indicated his belief that his lawyer had not correctly informed him. The judge answered that he would not speak to the defendant, ordered the jury out and had the defendant bound. When the defendant complained that a guard was stepping on him, he was gagged, ungagged and regagged, whereupon the jury panel was brought in. As defendant attempted to speak, the judge, before the sworn and prospective jurors, instructed the court officer to gag him "more effectively." An altercation thereupon ensued and the gag slipped off defendant's mouth. The trial judge rebuked a court officer for removing the gag. After sporadic interjections by the defendant complaining of his counsel, the judge ordered him gagged again. The gag loosened and the defendant requested a challenge. When the court allowed him one peremptory challenge, the defendant indicated he wanted "to challenge the whole panel." Thereupon the trial judge ordered him regagged. Before the entire jury, defendant repeated, apparently while still gagged, his objection to the whole panel, and the jury was sworn.
The altercation in the courtroom and the binding and gagging of the defendant had a marked impact on the prospective jurors. One expressly stated that the events were "stirring [him] up. Bothering [his] stomach." Another asked to be excused "[m]uch for the same reasons given before by the other jurors."
*1340 While conceding that a trial conducted when defendant was bound was "unseemly ... ungamely", the trial court nevertheless denied defense motions to excuse the panel. In an attempt to reduce prejudice the court did instruct the jury:
... Your judgment should not be affected one way or the other by prejudice or sympathy.
No prejudice. No prejudice against the defendant for what is happening and what happened just a second ago while I was speaking to you. No sympathy for him. You see? It works both ways.
Now ... just eliminate from your minds anything which you hear said from the well of the courtroom and certainly forget what transpired here.
As I said, what happened could very well be considered a normal reaction of one under strain.
Convicted of robbery, grand larceny, assault and possession of weapons, petitioner was sentenced to an indeterminate sentence of up to twenty-five years. He is presently in custody for a parole violation.

B. Equipment

As the trial judge indicated, there would have been no need for physical restraints in open court had there been available closed circuit equipment to enable petitioner to observe the proceedings while physically away from the courtroom. Both parties agree that the requisite equipment could have been quickly and inexpensively installed.
A system allowing defendant to hear proceedings and communicate with his counsel can be purchased and permanently installed for between $1400 and $1730. For an additional eight or nine hundred dollars, a video system can be made operational that would allow defendant to visually observe the proceedings. The amount of time involved for installation was estimated at one day. Renting such equipment as neededthe method used by the federal court in this district  reduces cash outlay. It should be noted that these calculations do not reflect the countervailing savings that would be generated by eliminating the need for a large number of guards in the courtroom to control a disruptive defendant.
This court takes judicial notice of the stringency of city and state budgets. F.R. Evid.R. 201. See also Rhem v. Malcolm, 507 F.2d 333 (2d Cir. 1974) (court considers financial condition of New York City). Yet the amount in question is relatively quite small since the budget for fiscal 1980-81 for the New York court system is $408,719,980. Budget, N. Y. State Office of Court Administration.

II. LAW

A. Physical Restraint

Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), exemplifies our legal system's ancient disdain for physically restraining defendants in the courtroom. "In an unbroken line of precedents and treatises from Hale to Hawkins through Blackstone ..., the principle is reiterated that the defendant shall not be shackled or manacled during his trial." Krauskopf, Physical Restraint of the Defendant in the Courtroom, 15 St. Louis Univ.L.J. 351, 352 (1971). According to the earliest writers, binding and shackling a defendant is improper because it constitutes infliction of punishment before conviction and would probably serve to confuse the defendant and impair his ability to defend himself.
Bracton saith ... if felons come in judgment to answer they shall be out of irons, and all manner of bonds, so that their pain shall not take away any manner of reason ... And in another place he saith ... It is an abuse that prisoners be charged with irons, or put to any pain before they be attainted.
3 Coke Inst. 34, quoted in Krauskopf, Physical Restraint of the Defendant in the Courtroom, 15 St. Louis Univ.L.J. 351 (1971). In these early days the chains and shackles were apparently themselves so painful as to interfere with rational thought of the prisoner. Id.
Today, when the restraints themselves are not so painful, the problem of jury prejudice is the most prevalent justification *1341 for the rule against using restraints if they can possibly be avoided. As pointed out in the early case of State v. Kring, 64 Mo. 591, 593 (1877):
When the court allows a prisoner to be brought before a jury with his hands chained in irons, and refuses, on his application, or that of his counsel, to order their removal, the jury must necessarily conceive a prejudice against the accused, as being in the opinion of the judge a dangerous man, and not one to be trusted. ..
See also, e. g., Kennedy v. Cardwell, 487 F.2d 101, 105-106 (6th Cir. 1973) cert. den., 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974). In Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), Mr. Justice Black crystallized the prejudice rationale:
Trying a defendant for a crime while he sits bound and gagged before the judge and jury would to an extent comply with that part of the Sixth Amendment's purposes that accords the defendant an opportunity to confront the witnesses at the trial. But even to contemplate such a technique, much less see it, arouses a feeling that no person should be tried while shackled and gagged except as a last resort. Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feeling about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold.
397 U.S. at 344, 90 S.Ct. at 1061 (emphasis added). See also Hardee v. Kuhlman, 581 F.2d 330, 333 n. 2 (2d Cir. 1978).
Contumacious or not, every defendant is entitled to the presumption of innocence which, "although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." Estelle v. Williams, 425 U.S. 501, 503, 96 S.Ct. 1691, 1692, 48 L.Ed.2d 126 (1976) (prison clothes); see also Walker v. Butterworth, 599 F.2d 1074, 1080 (1st Cir.), cert. den., 444 U.S. 937, 100 S.Ct. 288, 62 L.Ed.2d 197 (1979) (confinement of defendant to "prisoner dock" during trial "may create the impression that he is somehow different or dangerous"). Incapacitating a defendant in such a humiliating way has the effect of attenuating the presumption of innocence and reducing somewhat the state's burden of persuasion since in effect the jury has been told by the judge: "This person is dangerous." The forbidden inference from bad character to the particular bad act charged becomes one that some or all jurors are likely to adopt. F.R.Evid.R. 404(a).
Courts generally do not require shackled defendants to make a specific showing of prejudice. Rather they assume that there was prejudice and proceed instead to ask whether, under the circumstances, the shackling was nevertheless justified. See, e. g., Kennedy v. Cardwell, 487 F.2d 101, 107 (6th Cir. 1973), cert. den., 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974); United States v. Samuel, 431 F.2d 610, 615 (4th Cir. 1970), cert. den., 401 U.S. 946, 91 S.Ct. 964, 28 L.Ed.2d 229 (1971); Loux v. United States, 389 F.2d 911, 919 (9th Cir.), cert. den., 393 U.S. 867, 89 S.Ct. 151, 21 L.Ed.2d 135 (1968). No sufficient justification has been shown in either the state court or in proceedings in this court. 28 U.S.C. § 2254(d). See Sumner v. Mata, ___ U.S. ___, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). The presumption of correctness of state proceedings does not exist. See 28 U.S.C. § 2254(d)(3)(8).

B. Less Drastic Alternatives

No court has declared the use of shackles per se unconstitutional; a trial court must have discretion to use some devices in preserving order in the courtroom. Nevertheless, our courts agree that shackles be a measure of last resort, justified only where no less drastic alternative would suffice. In Kennedy v. Cardwell, 487 F.2d 101 (6th Cir. 1973), cert. den., 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974), for example, the Sixth Circuit, while affirming the use of shackles for a defendant who was believed likely to attempt escape, urged the use of less drastic alternatives prior to a resort to shackling. The court held that physical restraints should not be employed *1342 when "the trial court [has] available less prejudicial but adequate means of security. ..." 487 F.2d at 111.
Because every criminal defendant is entitled under the fourteenth amendment's due process clause to a fair and impartial trial there are ... sound reasons underlying the general rule that a defendant should never be shackled during his trial before a jury except in extraordinary circumstances. Without repeating all of them, we note the inherent prejudice to the accused when he is cast in the jury's eyes as a dangerous, untrustworthy and pernicious individual from the very start of the trial. Therefore, only upon a clear showing of necessity should shackles ever be employed.
Id. (emphasis in original). The court declared that "it is an abuse of discretion precipitously to employ shackles when less drastic security measures will adequately and reasonably suffice." Id. See also United States v. Esquer, 459 F.2d 431, 433 (7th Cir. 1972), cert. den., 414 U.S. 1006, 94 S.Ct. 366, 38 L.Ed.2d 243 (1973) ("only in cases of extreme need"); United States v. Theriault, 531 F.2d 281, 284 (5th Cir.), cert. den., 429 U.S. 898, 97 S.Ct. 262, 50 L.Ed.2d 182 (1976) ("an extreme measure"); Badger v. Cardwell, 587 F.2d 968 (9th Cir. 1978) ("trial court must look for corrective measures that do least injury to these rights consistent with the preservation of an orderly court atmosphere"); United States v. Samuel, 431 F.2d 610, 615-16 (4th Cir. 1970), cert. den., 401 U.S. 946, 91 S.Ct. 964, 28 L.Ed.2d 229 (1971) ("bound to have some prejudicial effect"); Dorman v. United States, 435 F.2d 385, 398 (D.C.Cir.1970) (en banc).
At least two district courts have granted habeas corpus relief expressly because no consideration was given to more humane methods of control. In Woodards v. Maxwell, 303 F.Supp. 690 (S.D.Ohio 1969), aff'd on other grounds sub nom. Woodards v. Cardwell, 430 F.2d 978 (6th Cir. 1970), cert. den., 401 U.S. 911, 91 S.Ct. 874, 27 L.Ed.2d 809 (1971), the court granted habeas corpus relief in part because
the state trial judge, by his own admission, failed to explore reasonable alternative methods of security. In light of the evidence produced at the evidentiary hearing in this court, the exploration of these alternatives may have prevented the prejudice resulting to the petitioner.
303 F.Supp. at 697. While the Sixth Circuit affirmed on other grounds, it did make express reference to the failure of the trial judge to consider alternatives to shackling. 430 F.2d at 982.
Similarly, in Hardin v. Estelle, 365 F.Supp. 39 (W.D.Tex.), aff'd without reaching the issue, 484 F.2d 944 (5th Cir. 1973), the court granted the habeas corpus petition of a defendant who had been shackled during trial. "There are numerous ways in which the courtroom could have been made temporarily safe, and the rights of the petitioner protected, without the use of shackles." Id. at 47. See also, e. g., The Supreme Court, 1969 Term, 84 Harv.L.Rev. 30, 90, 96 and n.36 (1970); Note, "Illinois v. Allen: the Unruly Defendant's Right to a Fair Trial," 46 N.Y.U.L.Rev. 120, 142 n. 128, 143-46 (1971); Comment, Exclusion from the Trial as Controlling Defendant Misbehavior: An Alternative Approach, 1970 U. of Ill.L.F. 273, 286-87.
This search for less prejudicial alternatives where constitutional rights are at stake is part of a broad constitutional policy. See, e. g., Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960) (invalidating law that obligated school teachers to disclose the organizations to which they belonged in part because "less drastic means for achieving the same basic purpose" were available); Memorial Hospital v. Maricopa County, 415 U.S. 250, 267, 94 S.Ct. 1076, 1087, 39 L.Ed.2d 306 (1974) (right to travel); Dunn v. Blumstein, 405 U.S. 330, 342, 353, 92 S.Ct. 995, 1003, 1008, 31 L.Ed.2d 274 (1972) (voter residence laws); Lessard v. Schmidt, 349 F.Supp. 1078, 1096 (E.D.Wis.1972), vacated and remanded for a more specific order, 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661, order on remand 379 F.Supp. 1376 (E.D.Wis.1974), vacated and remanded on other grounds, 421 U.S. 957, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975), order reinstated on remand, 413 F.Supp. 1318 *1343 (E.D.Wis.1976) (institution for mental health should be least restrictive of patient's liberty interests); see generally P. Brest, Processes of Constitutional Decision-making 990-994 (1975).

C. Obligation of State to Provide Necessary Funds

The willingness of courts to recognize that protecting individual rights may cost money is especially evident in the context of the rights of criminal defendants. Thus, for example, the Supreme Court has ordered the provision of counsel to indigents in felony cases, Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), transcripts to indigents in criminal appeals, Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), and counsel to indigents where the merits of their appeal are to be determined, Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963). See Eisenberg & Yeazell, The Ordinary and the Extraordinary in Institutional Litigation, 93 Harv.L.Rev. 465, 509 (1980). These cases and others recognize the fundamental interest of each defendant in the process by which his guilt or innocence is determined.
The Supreme Court has even ordered the expenditure of State funds to protect the criminal rights of individuals whose guilt has already been determined. In Bounds v. Smith, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), the Court held that states must affirmatively provide adequate law libraries or legal assistance to prisoners. It noted that a prisoner's interest in access to the courts, and thus in adequate legal research facilities, could not be defeated solely because it would be expensive for the states to recognize that interest. 430 U.S. at 823-25, 97 S.Ct. at 1495-96.
A mandate that binding and gagging be "a last resort," Illinois v. Allen, 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970), would be mere persiflage if it did not import the message that some funds might need to be expended to finance alternatives. Speaking of physical restraints in the courtroom, the Sixth Circuit has held that "only upon a clear showing of necessity should shackles ever be employed. One element of such necessity is that less drastic security precautions to prevent escape, even at some additional cost to the state, will not provide the needed protection." Kennedy v. Cardwell, 487 F.2d 101, 111 (6th Cir. 1973), cert. den., 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974) (emphasis added).
Courts do not refrain from invalidating a law or procedure merely because an acceptable alternative less destructive of an individual's constitutional rights would cost money. See, e. g., Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) (filing fees for primary candidates held unconstitutional, since states could finance the primaries if necessary). We need not here rehearse the many instances where state funds were required to ensure protection of individual constitutional rights in schools, mental hospitals, prisons and courts. Nor is there cause to cite the myriad examples of payments required to the poor, the sick, the disabled and those discriminated against because of race, age, sex and creed, where the state seeks to avoid a declaration that a practice is unconstitutional. See, e. g., Shapiro v. Thompson, 394 U.S. 618, 633, 89 S.Ct. 1322, 1330, 22 L.Ed.2d 600 (1969) (an otherwise invidious classification cannot be justified on the ground of saving welfare costs); Inmates of Suffolk County Jail v. Eisenstadt, 360 F.Supp. 676, 687 (D.Mass.1973), aff'd, 494 F.2d 1196 (1st Cir.), cert. den., 419 U.S. 977, 95 S.Ct. 239, 49 L.Ed.2d 189 (1974) ("... it is fundamental that a deprivation of constitutional rights may not be justified upon economic considerations"); Special Project, The Remedial Process in Institutional Reform Litigation, 78 Colum.L.Rev. 784, 865 (1978).

D. Absence of Waiver

That petitioner brought the restrictions on himself by obstreperous behavior is irrelevant in resolving the question now posed. His behavior required only that the court exercise some means of control; it did not authorize the court to use controls unnecessarily restrictive of petitioner's right to a fair trial. Whether or not petitioner may have waived his right to be physically present during the course of his trial, he did not give up his right to an unprejudiced jury.
*1344 Where important constitutional rights are at stake, which of the parties set the violation in motion is not decisive. Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) is instructive. In Rideau the Supreme Court reversed the conviction of a petitioner who had been convicted in state court of murder. Prior to trial he had given an interview in prison at which he confessed to the crime. That interview was then televised throughout the community, and three members of the jury indicated on voir dire that they had seen the interview. Petitioner's motion for change of venue was denied. In reversing his conviction, the court dismissed as irrelevant any consideration of who initiated the interview:
In the view we take of this case, the question of who originally initiated the idea of the televised interview is, in any event, a basically irrelevant detail. For we hold that it was a denial of due process of law to refuse the request for a change of venue, after the people of Calcasieu Parish had been exposed repeatedly and in depth to the spectacle of Rideau personally confessing in detail to the crimes with which he was later to be charged. For anyone who has ever watched television the conclusion cannot be avoided that this spectacle, to the tens of thousands of people who saw and heard it, in a very real sense was Rideau's trial  at which he pleaded guilty to murder. Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality.
373 U.S. at 726, 83 S.Ct. at 1419 (emphasis in original). See also United States v. Schiff, 612 F.2d 73 (2d Cir. 1979) (reversing conviction where videotape of prejudicial television "talk show" interview of defendant was admitted at trial).
The instant case stands on much the same footing as Rideau. Petitioner's own misbehavior may have set the stage for the violations of which he complains. But that does not vitiate his right to insist that the prejudice be mitigated as far as reasonably possible.

E. Discretion to Utilize New Technology

Arguendo the trial court would not have abused its discretion had it decided that the proper way to handle the emergency created by defendant's conduct was to do what he in fact did  have the petitioner bound and gagged in full view of the jury. The fact is, however, that the court exercised its discretion not to use this option, but rather to utilize a less prejudicial technique now readily available. The state, by failing to provide proper facilities, denied the court the opportunity to fulfill its constitutional duty of protecting defendant's rights. Every person in this country is entitled to the protection of a puissant court.
Due process requires the courts to adjust to changing technology. The meaning of the Constitution may remain the same but its manifestations and impact vary with time. Though the framers could not have conceived of the technique, electronic eavesdropping must be accounted for. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). A prisoner is entitled to today's modern medical treatment, Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), not what may have been available at the time the Constitution was adopted, or even what may have been acceptable a decade ago. Witnesses are deemed available when they can be carried by aircraft rapidly from long distances; notice by telephone or telegraph rather than by the method used by Paul Revere is expected. So, too, where the technique of chains, irons and gags might have been the only one available when the Bill of Rights was written, we take judicial notice that more effective and less prejudicial means are now at hand. Cf. Chandler v. Florida, ___ U.S. ___, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981) (changes in technology make T.V. cameras in courtroom acceptable even though earlier models interfered too greatly with trials); see also Zimmerman, Overcoming Future Shock: Estes Revisited, or a Modest Proposal for the Constitutional Protection of the News-Gathering Process, 1980 Duke L.J. 641. At any given time, the process that is due defendants must be a function of the rapidly evolving technology that is contemporaneously available.
*1345 Courts have been influenced by the availability of electronic monitoring devices in deciding whether or not to uphold particular restraints on unruly defendants. For example, in United States v. Ives, 504 F.2d 935 (9th Cir. 1974), vacated on other grounds, 421 U.S. 944, 95 S.Ct. 1671, 44 L.Ed.2d 97 (1975), the court noted the "appropriate steps" taken by the trial court in controlling the defendant:
As one such precaution he ordered the installation of special sound equipment in the courtroom and in a cell beneath it, so that in the event that it became necessary to remove Ives from the courtroom, he could hear the proceedings. Likewise, he ordered the installation of special telephones, with lights rather than bells, in the cell and on defense counsel's table so that Ives could communicate with his attorneys during the course of the proceedings.
504 F.2d at 937-38 (footnote omitted). Similarly, in United States v. Munn, 507 F.2d 563 (10th Cir. 1974), cert. den., 421 U.S. 968, 95 S.Ct. 1959, 44 L.Ed.2d 456 (1975), the court sustained the expulsion of the defendant but added, "[i]n connection with his removal from the courtroom, it should be noted that even though removed from the courtroom, Munn was able to hear the progress of his trial through a broadcasting system." 507 F.2d at 567.
Such methods have repeatedly been used in unreported cases in the United States District Court for the Eastern District of New York. This court has found in its own experience that making electronic equipment available will often quickly bring the defendant around to a more compliant attitude permitting prompt reentry into the courtroom.

III. FAILURE TO PROTECT DEFENDANT'S RIGHTS
Electronic monitoring devices are plainly a less drastic alternative to binding and gagging a defendant. They should be considered by a trial court before imposing shackles. Where, as here, the court decided to use such a device but was unable to make use of it due to state-imposed financial constraints, petitioner was deprived of his right to the least drastic means of control. The mere fact that such devices were not available during petitioner's trial because the state did not provide them does not vitiate petitioner's right to insist that when the trial court wishes to exercise that option it be available to him.
Because the State failed to provide monitoring equipment, the trial court did not have the means to select the form of control that it preferred and that would have been less restrictive of the petitioner's constitutional rights. The small effort required of the state in this instance lends force to the perception that the trial court was wrongly denied the opportunity to exercise its discretion.
The trial judge did not abuse its discretion, he simply was prevented from exercising it. We hold not that the trial court's exercise of discretion was abused, but rather that it was impermissibly frustrated by the state's refusal to supply the necessary equipment.
Petitioner was prejudiced. He remained bound and gagged until after the jury was empaneled and sworn and the opening statements were about to begin. Thus, each of the jurors witnessed the tumultuous proceedings, including prejudicial colloquy about whether or not the bounds and gags should be removed.
The trial court sought to counter the prejudice by means of limiting instructions. In the circumstances of this case, such instructions were not, indeed could not have been, sufficient.
We do not doubt that in most cases a jury is capable of abiding by the court's limiting instructions. But to regard `cautionary instructions as talismans for the solution of any possible prejudice problem' is tantamount to `effecting a repeal of the prejudice rule, which by its terms concedes the possibility that the negative aspects of some evidence may simply be unmanageable for the factfinder regardless of prejudice.'
United States v. Schiff, 612 F.2d 73, 82 (2d Cir. 1979), quoting Dolan, Rule 403: The Prejudice Rule in Evidence, 49 So.Cal.L. *1346 Rev. 220, 248-250 (1976); Bruton v. United States, 391 U.S. 123, 125, 88 S.Ct. 1620, 1622, 20 L.Ed.2d 476 (1968).

CONCLUSION
There was violence by the defendant, public charges of racial prejudice, tying and gagging of petitioner and a proceeding that verged on a shambles. The trial court made good faith efforts to minimize prejudice by instructing the jury and admonishing defendant and counsel, as well as by periodically releasing petitioner. Nevertheless, the all-white jury trying this black, disruptive defendant must have been adversely affected by the scene.
The trial court was prevented from protecting the rights of the defendant because of lack of proper facilities. Under the circumstances due process was denied. The judgment of conviction is vacated.
So ordered.